Massa, Justice.
 

 The Indiana Constitution imposes on the General Assembly a duty "to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." Ind. Const. art. 8, § 1. To help finance this lofty goal, our constitutional framers established a "Common School fund," the principal of which "may be increased, but shall never be diminished."
 
 Id.
 
 §§ 2, 3. Among other sources of revenue, this Fund "shall consist" of "all forfeitures which may accrue."
 
 Id.
 
 § 2.
 

 In implementing this constitutional command, Indiana's Civil Forfeiture Statute directs the transfer of proceeds from seized property "to the treasurer of state for deposit in the common school fund."
 
 Ind. Code § 34-24-1-4
 
 (d) (2018). But before these proceeds accrue to the Fund, the Statute permits the allocation of forfeiture revenue to reimburse law enforcement costs. Whether this cost offsetting is constitutional under article 8, section 2 has been "an unresolved question" by this Court.
 
 See
 

 Serrano v. State
 
 ,
 
 946 N.E.2d 1139
 
 , 1142 n.3 (Ind. 2011). Today, however, we answer that question in the affirmative.
 

 Facts and Procedural History
 

 In 2013, law-enforcement personnel seized two vehicles from Jeana and Jack Horner. The Marion County Prosecutor's Office filed a forfeiture action against the vehicles, claiming they had been used to transport marijuana. The Horners eventually recovered their vehicles after the underlying criminal charges were dismissed. Two and a half years later, the Horners and others sued, as "Indiana citizens and taxpayers," to "redress Marion County's profit-driven forfeiture program and to vindicate the public rights secured by Article 8 of the Indiana Constitution and the Civil Forfeiture Statute." Appellees' Supp. App. Vol. II, p. 6. In their claim against the Consolidated
 
 City
 
 of Indianapolis and Marion County and the Marion County
 
 Prosecutors Office,
 

 [1]
 
 Taxpayers sought declaratory and injunctive relief, specifically alleging that the Indiana Civil Forfeiture
 
 Statute
 
 unconstitutionally diverts forfeiture revenue from the Common School Fund (or simply,
 
 the Fund
 
 ).
 

 The Statute in force when Taxpayers sued authorized the prosecutor to file a complaint requesting the court to offset forfeiture revenue for reimbursement of case-specific "law enforcement costs." I.C. § 34-24-1-3(a) (2011). If the prosecutor succeeded in showing by a preponderance of the evidence that the property was subject to forfeiture, the court would "determine the amount of law enforcement costs" and then order any remaining proceeds which exceeded those costs to "be forfeited and transferred to the treasurer of state for deposit in the common school fund." I.C. §§ 34-24-1-4(a), (d) (2002).
 

 In 2018, however, the Indiana General Assembly amended the Statute.
 
 See
 
 Pub. L. No. 47-2018, § 3,
 
 2018 Ind. Acts 270
 
 , 273-76 (pertinent section codified at I.C. § 34-24-1-4(d)(3) ). Under the new Statute-which became effective July 1, 2018-the prosecutor need not submit a formal request for the reimbursement of forfeiture-execution costs.
 
 See
 
 I.C. § 34-24-1-3. And instead of using the case-specific reimbursement scheme, as under the former law, the new Statute outlines a specific formula for distributing these costs. First, if the prosecutor's office employs "outside counsel" to handle the forfeiture, the proceeds pay for any attorneys' fees accrued. I.C. § 34-24-1-4(d)(3)(A). Next, one-third of the remaining proceeds "shall be deposited into the forfeiture fund established by the prosecuting attorney." I.C. § 34-24-1-4(d)(3)(B). Eighty-five percent of the residual balance then goes to either the law-enforcement office that executed the forfeiture or the state's general fund. I.C. §§ 34-24-1-4(d)(3)(C), (D). The remaining ten percent is "forfeited and transferred to the treasurer of state for deposit in the common school fund." I.C. § 34-24-1-4(d).
 

 After the Governor signed the new Statute into law, but before it went into effect, Taxpayers moved to "amend or supplement their complaint" with a challenge to the new Statute. Appellant's App. Vol. II, p. 159. Both versions of the law, they argued, violated article 8, section 2 by offsetting
 
 any
 
 forfeiture proceeds intended for the Fund. The trial court denied this request and later granted summary judgment for the City, concluding that the Statute was constitutional because civil forfeitures "were unknown in 1851 when Article 8, Section 2, was added to the Indiana Constitution." Appellant's App. Vol. II, p. 172.
 
 [2]
 

 Taxpayers appealed, requesting direct transfer to this Court under Appellate Rule 56(A).
 
 [3]
 
 Because this "appeal involves a substantial question of law of great public importance,"
 

 id.
 

 , we accepted jurisdiction.
 

 Standard of Review
 

 The constitutionality of an Indiana statute is a pure question of law we review de novo.
 
 City of Hammond v. Herman & Kittle Properties, Inc.
 
 ,
 
 119 N.E.3d 70
 
 , 78 (Ind. 2019). These statutes, however, come to us "clothed with the presumption of constitutionality until clearly overcome by a contrary showing."
 
 Whistle Stop Inn, Inc. v. City of Indianapolis
 
 ,
 
 51 N.E.3d 195
 
 , 199 (Ind. 2016) (internal quotations omitted).
 

 Discussion and Decision
 

 Taxpayers argue that "[b]oth versions of the Civil Forfeiture Statute violate the Indiana Constitution based on a straightforward application of Article 8." Appellants' Br. at 16. They insist that " 'all forfeitures' " belong to the Common School Fund, not just a percentage of those forfeitures.
 

 Id.
 

 (quoting Ind. Const. art. 8, § 2 ).
 

 The City counters that the legislature may define the circumstances under which forfeiture proceeds vest in the Fund and that "awards of law-enforcement costs are not forfeitures" that accrue to the state. City's Br. at 16. The Prosecutor's Office adds that the scope of article 8, section 2 does not include civil forfeitures and that, even if it did, it confers no private right of enforcement. Instead, the Prosecutor's Office asserts, the General Assembly can authoritatively define article 8, section 2's scope. Prosecutor's Br. at 21.
 

 I. Do Taxpayers have standing?
 

 A threshold question for this Court is whether Taxpayers have standing to litigate their claim.
 

 The doctrine of standing asks whether the plaintiff is the proper person to invoke a court's authority.
 
 City of Indianapolis v. Indiana State Bd. of Tax Comm'rs
 
 ,
 
 261 Ind. 635
 
 , 638,
 
 308 N.E.2d 868
 
 , 870 (1974). Typically, "the party challenging the law must show adequate injury or the immediate danger of sustaining some injury."
 
 Pence v. State
 
 ,
 
 652 N.E.2d 486
 
 , 488 (Ind. 1995) (citing
 
 Frothingham v. Mellon
 
 ,
 
 262 U.S. 447
 
 ,
 
 43 S.Ct. 597
 
 ,
 
 67 L.Ed. 1078
 
 (1923) ). The purpose of standing-along with the corollary doctrines of mootness and ripeness-is to ensure the resolution of real issues through vigorous litigation, not to engage in academic debate or mere abstract speculation.
 

 Id.
 

 At a more fundamental level, standing implicates the constitutional foundations on which our system of government lies. By requiring a party to show a specific injury, the doctrine limits the judiciary to resolving concrete disputes between private litigants while leaving questions of public policy to the legislature and the executive. Indeed, standing "precludes courts from becoming involved ... too far into the provinces of the other branches." Jon Laramore,
 
 Indiana Constitutional Developments
 
 ,
 
 37 Ind. L. Rev. 929
 
 , 930 (2004). It is a vital element in the separation of powers, the disregard of which inevitably leads to "an overjudicialization of the processes of self-governance." Antonin Scalia,
 
 The Doctrine of Standing as an Essential Element of the Separation of Powers
 
 ,
 
 27 Suffolk U. L. Rev. 881
 
 , 881 (1983).
 

 Unlike its federal counterpart, the Indiana Constitution imposes no "case or controversy" restriction on the "judicial power of the State."
 
 Compare
 
 U.S. Const. art. III,
 
 with
 
 Ind. Const. art. 7. But the express distribution-of-powers clause in our fundamental law performs a similar function, serving as a principal justification for judicial restraint.
 
 See
 
 Ind. Const. art. 3, § 1 (dividing the "powers of the Government ... into three separate departments; the Legislative, the Executive including the Administrative, and the Judicial"). And so, as with the other branches of government, our responsibility lies in preserving these boundaries.
 
 [4]
 
 "Good fences make
 good neighbors," after all.
 
 Plaut v. Spendthrift Farm, Inc.
 
 ,
 
 514 U.S. 211
 
 , 240,
 
 115 S.Ct. 1447
 
 ,
 
 131 L.Ed.2d 328
 
 (1995).
 

 At its core, then, the doctrine of standing asks: Where should the remedy lie? With the courts, or through the franchise? With judges, or with our politically-accountable elected officials? Not every case discusses these broad questions, but they're always present in the pondering.
 

 Here, the Prosecutor's Office and the City both argue that our constitutional framers intended no private right to enforce article 8. Because the Common School Fund is " 'held by the State,' " they insist, Prosecutor's Br. at 14 (quoting Ind. Const. art. 8, § 7 ), the State alone may enforce article 8's constitutional obligations,
 
 id.
 
 at 14-21. Nineteenth-century precedent from this Court, they suggest, "confirmed" the framers' intent.
 
 Id.
 
 at 17.
 

 Taxpayers reject this proposition, arguing instead that "[t]his Court has long held that Hoosiers may enforce
 
 public
 
 rights." Appellants' Reply Br. at 26 (emphasis added). When "public rather than private rights are at issue," they maintain, "it is enough that the plaintiff be a citizen, and as such interested in the execution of the laws."
 
 Id.
 
 (internal quotations omitted). And this right to public standing, they contend, encompasses the right to "vindicate Article 8."
 
 Id.
 

 A. From the mid-nineteenth century through today, our standing jurisprudence reveals a gradual shift toward judicial restraint.
 

 On first impression, the early precedent on which the City and the Prosecutor's Office rely would seem to bolster their argument that the state alone may enforce article 8.
 
 See
 

 State ex rel. Smith v. McLellan
 
 ,
 
 138 Ind. 395
 
 , 398,
 
 37 N.E. 799
 
 , 800 (1894) ("[T]he attorney general was the proper relator in a suit to recover moneys belonging to the common-school fund of the state.");
 
 Bd. of Comm'rs of Tippecanoe Cty. v. State
 
 ,
 
 92 Ind. 353
 
 , 358 (1883) (same). But on closer look, nothing in those cases precludes a private party from enforcing article 8 on the state's behalf.
 
 [5]
 
 To the contrary, legislation enacted in the years immediately following constitutional ratification permitted "any person" to "maintain an action against" the township trustee, "in the name of the State of Indiana," to "recover for the use of the
 common school fund any sum not exceeding ten dollars." Act of Mar. 5, 1855, ch. 86, § 19,
 
 1855 Ind. Acts 161
 
 , 165.
 
 See also
 
 Act of Mar. 8, 1873, ch. 25, § 4,
 
 1873 Ind. Acts 75
 
 , 77 (providing that "the right of
 
 any person
 
 to bring suit in any court in any case arising under the school laws shall not be abridged") (emphasis added).
 

 Consistent with this legislation, a long line of precedent from this Court recognizes taxpayer standing to ensure the proper administration of public funds,
 
 including
 
 revenues either vested in or intended for the Common School Fund.
 
 See, e.g.
 
 ,
 
 Harney v. Indianapolis, Crawfordsville, & Danville R.R. Co.
 
 ,
 
 32 Ind. 244
 
 , 247 (1869) (recognizing taxpayer's "interest in the funds belonging to the county treasury as will enable him to maintain a suit to prevent unlawful appropriations thereof");
 
 Middleton v. Greeson
 
 ,
 
 106 Ind. 18
 
 , 28-29,
 
 5 N.E. 755
 
 , 761 (1886) (holding "that a taxpayer may enjoin" a township trustee from "contract[ing] for the building of a school-house, the cost of which would [have] largely exceed[ed] the amount of the special school fund");
 
 State ex rel. Colescott v. King
 
 ,
 
 154 Ind. 621
 
 , 623, 627-28,
 
 57 N.E. 535
 
 , 536, 538 (1900) (holding that a taxpayer is entitled to examine the county auditor's records to "ascertain or discover the true condition" of the public revenue);
 
 State v. Blind
 
 ,
 
 181 Ind. 689
 
 , 696,
 
 105 N.E. 225
 
 , 227 (1914) (permitting taxpayer-plaintiffs to sue a township trustee for the diminution of the Common School Fund in violation of article 8, section 3);
 
 Mitsch v. City of Hammond
 
 ,
 
 234 Ind. 285
 
 , 289, 290,
 
 125 N.E.2d 21
 
 , 23 (1955) (declaring that the "common school fund is a public fund of the state" in which "a taxpayer has such an interest" as to "enable him to maintain a suit ... to prevent unlawful waste or appropriations thereof").
 

 This legislation also codified the long-established principle that, when a private party seeks to vindicate a public right, "it is not necessary ... that the relator should have a special interest in the matter."
 
 Hamilton v. State ex rel. Bates
 
 ,
 
 3 Ind. 452
 
 , 458 (1852).
 
 See also
 

 Bd. of Comm'rs of Decatur Cty. v. State
 
 ,
 
 86 Ind. 8
 
 , 12 (1882) (concluding that the "decided weight of authority is to the effect that where the question is one of public concern, and the object of the mandate is to procure the enforcement of a public duty, the relator need not show that he has any legal or special interest in the result sought to be accomplished").
 
 See also
 
 Louis L. Jaffe,
 
 Standing to Secure Judicial Review: Public Actions
 
 ,
 
 74 Harv. L. Rev. 1265
 
 , 1269-75 (1961) (discussing the English common-law origins of the public action).
 

 Historically, then, our courts have been sympathetic toward standing, permitting private plaintiffs to vindicate a variety of claims, whether to enforce a public duty or to challenge the expenditure of public funds. Indeed, our historical precedent is replete with suits in which private parties, as relators, sought to compel the "levy [of] a railroad tax," the "repair [of] a bridge," "due diligence in keeping the highways ... in good repair," and the meeting of public officials for "the purpose of electing a county superintendent of schools."
 
 State ex rel. Sigler v. Bd. of Comm'rs of Madison Cty.
 
 ,
 
 92 Ind. 133
 
 , 134 (1883) ;
 
 State ex rel. Winterburg v. Demaree
 
 ,
 
 80 Ind. 519
 
 , 520 (1881) ;
 
 State ex rel. Cutter v. Kamman
 
 ,
 
 151 Ind. 407
 
 , 408,
 
 51 N.E. 483
 
 , 484 (1898) ;
 
 Wampler v. State ex rel. Alexander
 
 ,
 
 148 Ind. 557
 
 , 558,
 
 47 N.E. 1068
 
 , 1068 (1897).
 
 [6]
 

 But is there a point at which judicial accommodation of these claims threatens to upset the delicate balance of government powers that our constitution embodies? Aren't questions of tax policy, infrastructure repair, and local elections better suited for the legislative and executive branches of government?
 

 By the mid-twentieth century, this Court-tracking jurisprudential developments at the federal level-had signaled a more cautious approach to standing, finding it insufficient for a plaintiff to possess "merely a general interest common to all members of the public."
 
 Terre Haute Gas Corp. v. Johnson
 
 ,
 
 221 Ind. 499
 
 , 505,
 
 45 N.E.2d 484
 
 , 486 (1942) (citing
 
 Ex parte Levitt
 
 ,
 
 302 U.S. 633
 
 ,
 
 58 S.Ct. 1
 
 ,
 
 82 L.Ed. 493
 
 (1937) ). Rather, "[f]or the disposition of cases and controversies," this Court regularly required "adverse parties before it."
 
 City of Indianapolis v. Indiana State Bd. of Tax Comm'rs
 
 ,
 
 261 Ind. 635
 
 , 638,
 
 308 N.E.2d 868
 
 , 870 (1974). And standing, as a threshold matter in deciding a claim, also demanded these parties to "show injury."
 
 Bd. of Comm'rs of Howard Cty. v. Kokomo City Plan Comm'n
 
 ,
 
 263 Ind. 282
 
 , 286,
 
 330 N.E.2d 92
 
 , 96 (1975).
 

 Emblematic of this paradigm shift is
 
 Pence v. State
 
 ,
 
 652 N.E.2d 486
 
 (Ind. 1995), in which the plaintiff challenged as unconstitutional a legislative pay raise attached to an unrelated bill which the governor had signed into law.
 
 [7]
 

 See
 
 Ind. Const. art. 4, § 19 (confining legislation "to one subject and matters properly connected therewith");
 

 id.
 

 § 29 (prohibiting an increase in compensation for legislators "during the session in which [an] increase may be made"). The suit aimed a judicial harpoon straight at the heart of the legislative prerogative, attacking the practice of "logrolling," a process common to lawmaking that often requires back-scratching compromise, deal making, and coalition building. But in shielding "our state constitutional scheme of separation of powers," a majority of this Court prudently held that, with no "interest beyond that of the general public," the plaintiff lacked standing.
 
 Pence
 
 ,
 
 652 N.E.2d at
 
 488 (citing Ind. Const. art. 3, § 1 ). "While the availability of taxpayer or citizen standing may not be foreclosed in
 
 extreme circumstances
 
 ," the majority concluded, "it is clear that such status will rarely be sufficient."
 

 Id.
 

 (emphasis added).
 

 The opinion drew the dissent of Justice Dickson, who would have conferred standing on the plaintiff on two grounds: first, "as an Indiana taxpayer to challenge the constitutionality of the expenditure of public funds," and second, "under Indiana's public standing doctrine."
 

 Id.
 

 at 489
 
 . "Where public rather than private rights are at issue," he opined, "the usual requirements for establishing standing need not be met."
 

 Id.
 

 Justice Dickson's view in
 
 Pence
 
 gained further traction eight years later in
 
 State ex rel. Cittadine v. Indiana Department of Transportation
 
 ,
 
 790 N.E.2d 978
 
 (Ind. 2003). The plaintiff in that case, as a "member of the motoring public," petitioned for a writ of mandamus, seeking to compel INDOT to enforce a statute regulating railroad crossings.
 

 Id.
 

 at 984
 
 . The trial court denied the writ and the Court of Appeals affirmed on grounds that the plaintiff lacked standing. Despite this Court disposing of the case's merits on mootness grounds after the legislature amended the pertinent statute,
 

 id.
 

 , Justice Dickson wrote at length to "acknowledge
 the availability of the public standing doctrine in Indiana courts,"
 

 id.
 

 at 979
 
 . "[W]hen a case involves enforcement of a public rather than a private right," he opined, echoing his dissent in
 
 Pence
 
 , the plaintiff "need not have a special interest in the matter nor be a public official."
 

 Id.
 

 at 980
 
 (internal quotation marks omitted).
 

 Despite the plaintiff's complete lack of a "specific injury," the
 
 Cittadine
 
 opinion recites the general rule that standing requires a showing of harm and "a personal stake in the outcome of the litigation."
 

 Id.
 

 at 980, 979
 
 . Application of this rule by the majority in
 
 Pence
 
 , the Court reasoned, was "merely to express our exercise of judicial discretion with cautious restraint under the circumstances."
 

 Id.
 

 at 983
 
 . The recognition in
 
 Pence
 
 that public standing is limited to "extreme circumstances," the Court concluded, clearly "acknowledges the ... doctrine."
 
 [8]
 

 Id.
 

 Just four months after the decision in
 
 Cittadine
 
 , this Court again confronted the question of standing, this time in a constitutional claim under the Indiana Bill of Rights. In
 
 Embry v. O'Bannon
 
 , taxpayer-plaintiffs challenged the constitutionality of the state's "dual enrollment" statute, a measure allocating additional funds to parochial-school students enrolled in public-school courses.
 
 798 N.E.2d 157
 
 , 158 (Ind. 2003),
 
 modified on other grounds by
 

 Meredith v. Pence
 
 ,
 
 984 N.E.2d 1213
 
 (Ind. 2013) ;
 
 see
 
 Ind. Const. art. 1, § 6 (prohibiting the expenditure of public funds "for the benefit of any religious or theological institution"). Relying on
 
 Pence
 
 , both the trial court and the Court of Appeals determined that the taxpayers lacked standing.
 
 798 N.E.2d at 161
 
 . This Court, however, conferred standing while nevertheless upholding the statute as constitutional.
 

 Id.
 

 at 167
 
 . Because of their "shared public interest as taxpayers in the allegedly unconstitutional expenditure of public funds," Justice Dickson reasoned, joined by Justice Rucker, the plaintiffs fell "within the public standing exception to the general standing requirement."
 

 Id.
 

 at 160
 
 .
 

 Justice Sullivan, joined by Chief Justice Shepard, wrote a separate concurring opinion to "give more detailed attention" to standing.
 

 Id.
 

 at 167
 
 . Drawing on principles of Article III jurisprudence, the opinion explains that, because the constitution imposes " 'no absolute bar' " to taxpayer standing, those with a "concrete interest" in the expenditure of public funds may challenge a government action as exceeding its constitutional powers.
 

 Id.
 

 at 168-69
 
 (quoting
 
 Flast v. Cohen
 
 ,
 
 392 U.S. 83
 
 , 88,
 
 88 S.Ct. 1942
 
 ,
 
 20 L.Ed.2d 947
 
 (1968) ).
 
 [9]
 
 In other words, taxpayer status alone cannot confer standing. Instead, the parties must have " 'a personal stake in the outcome of the controversy.' "
 

 Id.
 

 at 168
 
 (quoting
 
 Flast
 
 ,
 
 392 U.S. at 99
 
 ,
 
 88 S.Ct. 1942
 
 ).
 
 [10]
 
 Because these plaintiffs properly raised an express constitutional limitation on the expenditure
 of public funds, Justice Sullivan concluded that the case presented the requisite "extreme circumstances" to establish taxpayer standing.
 

 Id.
 

 So where does this leave us? How do we reconcile these ostensibly competing theories of standing?
 
 [11]
 

 B. Taxpayer standing and public standing are distinct doctrines.
 

 In his dissent in
 
 Pence
 
 , Justice Dickson would have conferred standing on the plaintiff both "as an Indiana taxpayer to challenge the constitutionality of the expenditure of public funds" and "under Indiana's public standing doctrine."
 
 652 N.E.2d at 489
 
 . The Court in
 
 Cittadine
 
 , however, conflated these distinct grounds, creating a single public-standing doctrine which effectively exempts a plaintiff from showing
 
 any
 
 articulable harm, whether in raising a constitutional challenge or petitioning to enforce a statute, regulation, or other public law.
 
 790 N.E.2d at 983
 
 (declaring that the "public standing doctrine permits the assertion of
 
 all proper legal challenges
 
 , including claims that government action is unconstitutional") (emphasis added). This doctrinal obfuscation has led to some confusion among our courts on the precise contours of standing.
 
 See, e.g.
 
 ,
 
 Liberty Landowners Ass'n, Inc. v. Porter Cty. Comm'rs
 
 ,
 
 913 N.E.2d 1245
 
 , 1251 (Ind. Ct. App. 2009) (observing, in a challenge to a zoning ordinance, that "the public standing doctrine or the availability of taxpayer or citizen standing is limited to extreme circumstances"),
 
 trans. denied
 
 ;
 
 Meredith v. Pence
 
 ,
 
 984 N.E.2d 1213
 
 , 1217 n.4 (Ind. 2013) ("As taxpayers challenging allegedly unconstitutional use of public funds, the plaintiffs have standing under Indiana's public standing doctrine, an exception to the general requirement that a plaintiff must have an interest in the outcome of the litigation different from that of the general public.") (internal quotations omitted).
 

 While both doctrines overlap to some extent, unique rationales distinguish them. Taxpayer standing generally implicates a challenge to some government action that involves the expenditure or appropriation of public funds.
 
 See
 
 Joshua G. Urquhart,
 
 Disfavored Constitution, Passive Virtues? Linking State Constitutional Fiscal Limitations and Permissive Taxpayer Standing Doctrines
 
 ,
 
 81 Fordham L. Rev. 1263
 
 , 1278 (2012) (citing
 
 Cittadine
 
 for the proposition that Indiana "permit[s] 'public importance' or 'public interest' lawsuits, effectively in lieu of traditional taxpayer actions"). Public standing, on the other hand, involves a challenge to "virtually any government action," so long as there's a "substantial public interest, as determined by the court overseeing the lawsuit."
 

 Id.
 

 at 1279
 
 . Whereas the former doctrine has at least some "connection to an injury-in-fact, however tenuous it may be," the latter doctrine typically "has no basis in, and cannot be traced to, a particularized injury-in-fact."
 
 [12]
 
 M. Ryan Harmanis,
 Note,
 
 States' Stances on Public Interest Standing
 
 ,
 
 76 Ohio St. L.J. 729
 
 , 750 n.134 (2015).
 
 See also
 
 Jaffe,
 
 Standing to Secure Judicial Review
 
 , 74 Harv. L. Rev. at 1280 ("The point of the distinction ... is that the plaintiff in the taxpayer's suit is thought to be 'affected' in a sense that distinguishes him from the citizen who in mandamus is the mere instrument of the public's concern.").
 

 Public standing, then, as the
 
 Cittadine
 
 Court articulated, risks pushing the judiciary's role beyond the boundaries contemplated by our distribution-of-powers doctrine.
 
 See
 
 Harmanis,
 
 States' Stances on Public Interest Standing
 
 , 76 Ohio St. L.J. at 750 n.134 (concluding that "public interest standing functionally equates to the judiciary unilaterally expanding its own authority"). By permitting
 
 any
 
 person,
 
 without
 
 a showing of harm, to enforce a public right or duty, what limits are there? If all government action is subject to judicial review, what purpose does the political process serve?
 
 [13]
 
 What role does the franchise play? What incentive is left for our citizens to exercise their constitutional right of "applying to the General Assembly for redress of grievances"?
 
 See
 
 Ind. Const. art. 1, § 31.
 

 We need not answer these questions today because Taxpayers' claim involves an express constitutional limitation on the appropriation of public funds. And in resolving their claim, we give no precedential weight to
 
 Cittadine
 
 on the question of standing.
 
 [14]
 

 See
 

 Embry
 
 ,
 
 798 N.E.2d at 167
 
 (Sullivan, J., concurring) ("
 
 Cittadine
 
 was not a constitutional case.").
 
 See also
 
 Frank Sullivan, Jr.,
 
 A Look Back: Developing Indiana Law, Post-Bench Reflections of an Indiana Supreme Court Justice
 
 ,
 
 47 Ind. L. Rev. 1217
 
 , 1230 (2014) (observing that the plaintiff in
 
 Cittadine
 
 was not held to have standing "by virtue of being a
 taxpayer"). Instead, we rely on the concurring opinion in
 
 Embry
 
 for guidance. That opinion, we believe, offers a fair standard for taxpayer-plaintiffs seeking to litigate a constitutional claim. Indeed, by emphasizing the need to show " 'extreme circumstances,' "
 
 798 N.E.2d at 168
 
 (quoting
 
 Pence
 
 ,
 
 652 N.E.2d at
 
 488 ), the standard preserves the taxpayer-standing doctrine while respecting the balance of powers expressly called for in our state's fundamental law.
 

 By adopting the standard articulated in Justice Sullivan's
 
 Embry
 
 concurrence, we hold that, to establish taxpayer standing, a plaintiff must (1) raise a challenge seeking to vindicate an express constitutional limitation on the expenditure of public funds,
 
 [15]
 
 (2) demonstrate some personal stake in the outcome of the controversy, and (3) show "extreme circumstances" warranting judicial intervention.
 
 [16]
 

 C. Taxpayers have standing to litigate their claim under our taxpayer-standing doctrine.
 

 In applying our standard here, we conclude that Taxpayers have standing to litigate their claim. First, their claim clearly implicates an express constitutional limitation on the expenditure or appropriation of public funds.
 
 See
 
 Ind. Const. art. 8, § 3 (prohibiting the principal of the Common School Fund from being "diminished"). And because this Fund is a "public fund of the state" in which all taxpayers have an interest in preventing its "unlawful waste" or misappropriation, Taxpayers meet the second prong of our standard.
 
 See
 

 Mitsch
 
 ,
 
 234 Ind. at 290, 289
 
 ,
 
 125 N.E.2d at 23
 
 . Finally, because Taxpayers challenge the Civil Forfeiture Statute as an abuse of the legislative prerogative, and because the Prosecutor's Office agrees that this case "raise[s] a substantial question of Indiana constitutional law," Prosecutor's Resp. Mot. Trans. at 2, Taxpayers successfully present the "extreme circumstances" necessary to establish standing.
 
 See
 

 Pence
 
 ,
 
 652 N.E.2d at
 
 488 ;
 
 Embry
 
 ,
 
 798 N.E.2d at 168
 
 (Sullivan, J., concurring). In so concluding, this "Court does not overstep [its] limitations in deciding this challenge."
 
 Embry
 
 ,
 
 798 N.E.2d at 169
 
 (Sullivan, J., concurring).
 

 We also emphasize that, had Taxpayers brought their claim as a private party-whether in defending against civil or criminal liability or in seeking damages-this Court would have properly denied them standing.
 
 See
 

 Hoagland v. Franklin Twp. Cmty. Sch. Corp.
 
 ,
 
 27 N.E.3d 737
 
 , 741 (Ind. 2015) (holding that article 8, section 1 of the Indiana Constitution, "does not provide an individual with a private right of action for monetary damages");
 

 $100 and a Black Cadillac v. State
 
 ,
 
 822 N.E.2d 1001
 
 , 1015 (Ind. Ct. App. 2005) (concluding that a party, in defending against a forfeiture action after pleading guilty to dealing in drugs, did "not have standing to question" whether the Civil Forfeiture Statute violated article 8, section 2 ),
 
 trans. denied
 
 ;
 
 Michener
 
 ,
 
 120 Ind. 282
 
 , 283,
 
 22 N.E. 255
 
 , 255 (1889) (observing that "individual citizens have no private interest" in public funds).
 

 II. Article 8, section 2 applies to civil forfeitures.
 

 Turning to the merits, we must first determine whether article 8, section 2 applies to civil forfeitures. Civil forfeiture "is a device, a legal fiction, authorizing legal action against inanimate objects for participation in alleged criminal activity, regardless of whether the property owner is proven guilty of a crime-or even charged with a crime."
 
 Serrano v. State
 
 ,
 
 946 N.E.2d 1139
 
 , 1140 (Ind. 2011). In dismissing this case, the trial court reasoned that civil forfeitures "were unknown in 1851 when Article 8, Section 2, was added to the Indiana Constitution." Appellant's App. Vol. II, p. 172. But a cursory look at the historical record shows otherwise.
 

 "Since the earliest years of this Nation, Congress has authorized the Government to seek parallel
 
 in rem
 
 civil forfeiture actions and criminal prosecutions based upon the same underlying events."
 
 United States v. Ursery
 
 ,
 
 518 U.S. 267
 
 , 274,
 
 116 S.Ct. 2135
 
 ,
 
 135 L.Ed.2d 549
 
 (1996) (citing a federal statute from 1789). Maritime law propelled this practice during the early national period. A federal statute in 1819, for example, authorized officials to "seize" any "armed vessel or boat" for committing "piratical aggression." Act of Mar. 3, 1819, ch. 77, § 2,
 
 3 Stat. 510
 
 , 512-13. A court would then "order a sale" of the vessel, after certain proceedings, and distribute the proceeds.
 

 Id.
 

 § 4, 3 Stat. at 513. And "no personal conviction of the offender [wa]s necessary to enforce" those proceedings.
 
 The Palmyra
 
 , 25 U.S. (12 Wheat.) 1, 15,
 
 6 L.Ed. 531
 
 (1827),
 
 superseded by statute as stated in
 

 Honeycutt v. United States
 
 , --- U.S. ----,
 
 137 S. Ct. 1626
 
 , 1634,
 
 198 L.Ed.2d 73
 
 (2017). To the contrary, any "proceeding
 
 in rem
 
 stands independent of, and wholly unaffected by any criminal proceeding
 
 in personam
 
 ." 25 U.S. (12 Wheat.) at 1.
 

 In 1844, just seven years before the ratification of our 1851 Constitution, the U.S. Supreme Court reaffirmed federal authority to seize a vessel despite no underlying crime by its owner.
 
 The Malek Adhel
 
 , 43 U.S. (2 How.) 210, 233,
 
 11 L.Ed. 239
 
 (1844). "The vessel which commits the aggression is treated as the offender," the Court emphasized, "as the guilty instrument or thing to which the forfeiture attaches, without any reference whatsoever to the character or conduct of the owner."
 

 Id.
 

 Dictionaries and legal treatises contemporary to the 1850-51 debates offer a similar characterization of civil forfeitures. According to one dictionary available to the framers, a forfeiture involved any property "alienated by a crime, offense, neglect of duty, or breach of contract." Noah Webster,
 
 An American Dictionary of the English Language
 
 354 (1841),
 
 available at
 
 https://hdl.handle.net/2027/hvd.hnezz9.
 
 [17]
 
 Consistent with this definition, this Court held over a century ago that a "forfeiture may be generally defined to be the loss of what belongs to a person in consequence of some fault, misconduct or transgression of law."
 

 State ex rel. Baldwin v. Bd. of Comm'rs of Marion Cty.
 
 ,
 
 85 Ind. 489
 
 , 493 (1882). This loss of property, however, didn't depend on any underlying guilt of a property owner. As nineteenth-century legal scholar Joel Prentiss Bishop noted in his seminal treatise on criminal law, officials could seize property "without regard to whether the owner commits, at the same time, a crime or not."
 
 Commentaries on The Criminal Law
 
 , § 698 (1856). As with modern practice, property could be forfeited through civil proceedings, with the property "itself directly" held liable for any wrongful conduct.
 

 Id.
 

 § 703.
 

 From this brief historical inquiry, we have little doubt that our constitutional framers understood that "a conviction on the underlying criminal activity is not a prerequisite for forfeiture."
 
 Katner v. State
 
 ,
 
 655 N.E.2d 345
 
 , 348 (Ind. 1995). And because "Indiana's system for civil forfeitures proceeds under" article 8,
 
 Serrano
 
 ,
 
 946 N.E.2d at 1141
 
 , we hold that the Civil Forfeiture Statute falls within the scope of article 8, section 2.
 

 III. Article 8, section 2 permits the legislature to determine how and when forfeiture proceeds accrue to the Common School Fund.
 

 Indiana's Civil Forfeiture Statute directs the transfer of proceeds from seized property "to the treasurer of state for deposit in the common school fund." I.C. § 34-24-1-4(d). But before these proceeds accrue to the Fund, the Statute permits the allocation of forfeiture revenue to reimburse law enforcement costs.
 

 Id.
 

 Taxpayers argue that "the Civil Forfeiture Statute violates Article 8 of the Indiana Constitution by diverting forfeiture revenue from the common school fund." Appellants' Br. at 17.
 

 To determine the constitutionality of the Civil Forfeiture Statute, we must examine "the language of the
 
 text
 
 in the context of the
 
 history
 
 surrounding its drafting and ratification" as well as "the
 
 purpose and structure
 
 of our constitution."
 
 City of Hammond
 
 ,
 
 119 N.E.3d at 79
 
 (emphases added) (internal quotations omitted).
 

 A. Text of article 8.
 

 First, we turn to article 8's text. Article 8, section 2 dictates that, among other things, the Common School Fund "shall consist of ... [t]he fund to be derived from ... all forfeitures which may accrue."
 
 [18]
 
 Ind. Const. art. 8, § 2. According to Taxpayers, this "case begins and ends with a straightforward application" of this text.
 

 Appellants' Br. at 17. "The framers' intent could not be clearer," Taxpayers insist: "All forfeitures-not some forfeitures or ten percent of forfeitures-belong to the school fund."
 
 Id.
 
 at 27 (internal quotation marks omitted). And, according to Taxpayers, the Civil Forfeiture Statute violates article 8 because section 3 commands that the principal of this Fund "shall never be diminished" and must only be "appropriated to the support of Common Schools, and to no other purpose whatever."
 
 Id.
 
 (internal quotation marks omitted).
 

 As this Court observed nearly a century and a half ago, article 8 is "certainly not self-acting in [its] operation."
 
 State ex rel. Att'y Gen. v. Meyer
 
 ,
 
 63 Ind. 33
 
 , 40 (1878). Thus, "[l]egislation was requisite and necessary to carry [its] provisions into practical effect, and especially to create the 'common school fund.' "
 

 Id.
 

 [19]
 
 Indeed, in his December 1851 address to the General Assembly, Governor Joseph A. Wright impressed upon the legislature that it was their "duty to husband this fund ... to provide for the education of the youth of every county, township, and district." Indiana House Journal at 20 (Dec. 2, 1852). Heeding this call, the members of the Thirty-Sixth General Assembly crafted the 1852 Free School Law to, among other things, enliven "the provisions of the Constitution concerning the school funds" and provide "for their safe investment." Richard Gause Boone,
 
 A History of Education in Indiana
 
 144 (1892) (
 
 History of Education
 
 ).
 

 Nearly a century later, our Court of Appeals reaffirmed the legislature's prerogative to determine when and how money accrues to the Common School Fund. In
 
 State v. Elliott
 
 , the state treasurer challenged a statute requiring a county auditor to keep "a record of all fines, forfeitures and other revenue which accrues to the Common School fund," with the auditor only paying to the state treasurer those amounts biannually.
 
 171 Ind. App. 389
 
 , 392,
 
 357 N.E.2d 276
 
 , 278 (1976). This scheme, the treasurer argued, allowed the auditor to impermissibly divert money away from the Fund.
 

 Id.
 

 at 393
 
 ,
 
 357 N.E.2d at 279
 
 . But in upholding the statute, the Court of Appeals determined that a forfeiture "accrue[s] to the Common School fund" upon "possession of the Treasurer of State."
 

 Id.
 

 Until then, the "property rights of the State in the [Fund] have not vested."
 

 Id.
 

 at 392
 
 ,
 
 357 N.E.2d at 278
 
 .
 

 As further proof that the framers contemplated this legislative power, statutes permitting cost offset for forfeiture were in place as they assembled to craft our new constitution. For example, from 1836 to 1847, as the General Assembly incorporated various cities and towns across the state, legislation consistently permitted the payment of "[a]ll
 
 expenses incurred
 
 in prosecuting for the recovery of any penalty or forfeiture." Act of Feb. 8, 1836, ch. 3, § 34,
 
 1835 Ind. Acts 8
 
 , 16 (emphasis added).
 
 [20]
 
 And despite the 1816 Constitution
 requiring that "
 
 [a]ll
 
 fines, penalties and forfeitures ... inure to the use of the State or County," Ind. Const. of 1816, art. XII, § 2 (emphasis added), only those proceeds remaining after this offset were "paid to the treasurer for the use of said city," Act of Feb. 8, 1836, ch. 3, sec. 34, 1835 Ind. at 16. This section of the 1816 Constitution, as with its modern counterpart, contained no express language permitting the offsetting of costs. But, like the statute at issue in
 
 Elliott
 
 , these incorporation statutes-effective at the time of the 1850-51 Constitutional Convention-exhibit the framers' understanding that, even without express language permitting offset, the legislature can direct when and how forfeiture proceeds "accrue" or "inure" to the state. Indeed, this view tracks historical descriptions of certain revenue sources under section 2-forfeitures, criminal fines, and escheated estates-as "incidental," or, "contingent." Ind. Dep't of Public Instruction,
 
 First Annual Report
 
 45 (1852); Ind. Dep't of Public Instruction,
 
 Twentieth (Sixth Biennial) Report of the Superintendent of Public Instruction for the State of Indiana
 
 17 (1872).
 

 So, under article 8's text, the General Assembly can determine how and when a forfeiture accrues to the Common School Fund.
 

 B. History surrounding article 8.
 

 The history surrounding article 8 bolsters our plain reading of the text. In constitutional historical inquiries, we "examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy."
 
 Bayh v. Sonnenburg
 
 ,
 
 573 N.E.2d 398
 
 , 412 (Ind. 1991) (quotation marks omitted).
 

 Here, we agree with Taxpayers that our constitutional framers, in drafting article 8, sought to deter the dual mischiefs of malfeasance and financial incompetence that had become so pervasive among state and local officials administering school funds. Indeed, as Taxpayers maintain, the history of article 8 confirms that our constitutional framers "created a dedicated school fund to stop government actors from siphoning money from educational objectives." Appellants' Br. at 32. But Taxpayers' view of the history surrounding article 8 omits important context.
 

 Following the passage of Indiana's first comprehensive school law in 1824, "school revenue was inconsiderable" due to the "mismanagement of funds."
 
 History of Education
 
 at 26. Compounded by "local indifference and sometimes legislative evasion," the school law "was doomed to failure for lack of funds."
 
 Id.
 
 at 27. And despite "very elaborate" reform in 1833, "progress was discouragingly slow."
 
 Id.
 
 at 32, 34. Even as Hoosiers approached mid-century, further attempts to safeguard school funding proved "far from satisfactory."
 
 Id.
 
 at 38-39. In his address to the House of Representatives at the Twenty-Eighth Indiana General Assembly, Governor Samuel Bigger lamented that "our school funds were not producing the fruits which we had a right to expect, but were in danger in many cases of being irretrievably lost." Indiana House Journal at 18 (Dec. 5, 1843). According to the governor, accountability measures were necessary to ensure "the various education funds will be rendered much more secure and productive."
 
 Id.
 

 And this concern carried over into the debates over our 1851 constitution. Delegate John I. Morrison, chairman of the committee on education, reported to the convention that, "[i]n the present state of affairs, we have no means of ascertaining accurately, the true conditions" of the state's school fund. 2
 
 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana
 
 1860 (1851). According to Delegate Morrison, "abundant evidence" showed "the danger to which the several educational funds are exposed," with thousands of dollars "lost beyond recovery."
 
 Id.
 

 Still, despite the frustration shown by leaders during this period, we find no evidence of any steadfast commitment by the framers against the offsetting of proceeds collected from forfeitures or other contingent sources of revenue under section 2. To the contrary, the pre-accrual allocation of proceeds from these sources acted as a financial incentive to
 
 stimulate
 
 the Fund's growth.
 

 Just two years after the framers completed their work, William C. Larrabee, Indiana's first State Superintendent of Public Instruction, cited allegations in his second annual report to the General Assembly that public officers responsible for imposing "fines for breaches of the penal laws of the State" had "fail[ed] to issue process for the collection of such fines," thus depriving the Fund of significant resources.
 
 [21]
 
 Ind. Dep't of Public Instruction,
 
 Second Annual Report of the Superintendent of Public Instruction for the State of Indiana
 
 18 (1853).
 

 Little had changed in the years that followed. In his 1865 report to the General Assembly, Superintendent Samuel L. Rugg speculated that, of the fines and forfeitures collected, there had "probably been but little added" to the Fund. Ind. Dep't of Public Instruction,
 
 Thirteenth (Second Biennial) Report of the Superintendent of Public Instruction for the State of Indiana
 
 17 (1865). The reason for this, he suggests, was the lack of a "statute in force requiring officers to pay over or add to the school fund, the money collected upon forfeited recognizances, or upon any other kind of forfeitures."
 
 Id.
 
 at 17-18. Additional forfeiture proceeds, he concluded, would be unlikely, "unless there is some provision of law giving it that direction."
 
 Id.
 
 at 18.
 

 By 1872, the pressing need to incentivize the collection of fines, forfeitures, and other contingent revenue sources had become a priority. That year, Superintendent Milton Hopkins pled with the General Assembly for some "means of increasing" the Common School Fund. Ind. Dep't of Public Instruction,
 
 Twentieth (Sixth Biennial) Report of the Superintendent of Public Instruction for the State of Indiana
 
 33 (1872). "There is a wide spread belief ... among school officers and many others," he wrote, "that the fines, forfeitures and unclaimed witness fees, that are the parts of both fund and revenue are not faithfully reported."
 
 Id.
 
 To Hopkins, the dismal revenue stream at the time suggested that "justice [was] not so faithfully administered."
 
 Id.
 

 In a circular issued that same year, Attorney General Bayless Hanna reminded the county commissioners "that all fines assessed for breeches of the penal laws of the State, together with all forfeiture
 which may accrue, and all unclaimed fees, constitute a part of the Common School fund."
 
 Id.
 
 at 34. Income from these sources, he concluded, should "have resulted in vast revenues for the use of the State and the counties."
 
 Id.
 
 But an accounting by the state auditor revealed that "a vast sum of money" had either "not been ... collected according to law" or had "been appropriated to personal gain."
 
 Id.
 
 To correct this "malfeasance," he urged the county commissioners to "employ a competent Attorney, at reasonable compensation," to determine the extent to which "fines, forfeitures and unclaimed fees ... belonging to the School Fund" had "not been accounted for."
 
 Id.
 
 at 34-35.
 

 The General Assembly responded to these pleas at its following legislative session in 1873. At the behest of Governor Conrad Baker, lawmakers adopted a measure requiring "the Clerks of the several Circuit Courts" to, among other things, "forward to the Attorney General," at the close of each term, "a statement of all fines assessed and forfeitures entered during such term." Act of Mar. 10, 1873, ch. 7, § 4,
 
 1873 Ind. Acts 18
 
 , 19; 14 Brevier Legis. Rep. App., pp. 6-7 (1873) (message of Governor Baker to the General Assembly). The Act also required the attorney general to "ascertain from time to time the amounts paid to any public officer" for, among other revenue sources, "money unclaimed in estates or guardianships, fines or forfeitures, or moneys that escheat to the State for want of heirs." Act of Mar. 10, 1873, ch. 7, § 9, 1873 Ind. Acts at 20. Should any public officer "fail, neglect or refuse" to collect those revenue proceeds, the Act authorized the attorney general to prosecute "all necessary proceedings to compel the[ir] payment ... or recovery."
 
 Id.
 
 And to enable the attorney general "to ascertain the facts," the Act required a full accounting from every public officer with "custody of any such moneys."
 
 Id.
 
 To measure progress, "annual reports to the Secretary of State" were to include statistics on "[a]ll fines assessed and forfeitures entered in the State."
 
 Id.
 
 § 10, 1873 Ind. Acts at 20.
 

 As an incentive to prosecute these actions, the Act allocated to the attorney general, for "all collections made or property recovered," a "commission of twenty per cent. on the first thousand dollars, ten per cent. on sums not exceeding two thousand dollars, and on all sums exceeding two thousand dollars five per cent."
 
 [22]
 

 Id.
 
 And to "aid him in the discharge of his duties," the Act permitted the attorney general to employ assistants and to "pay to them
 
 out of the sums so collected
 
 " a commission "not exceeding ten per cent."
 
 Id.
 
 § 11, 1873 Ind. Acts at 20 (emphasis added). While the Act was expected to result in a "considerable increase in the salary of the Attorney General," Governor Baker reasoned that such expense "would be compensated fifty-fold by the increase of the school fund, by the collection of fines
 and forfeitures that are lost to the State under the present system." 14 Brevier Legis. Rep. App., p. 7.
 

 In 1879, this Court upheld the Act's compensation scheme. In
 
 State v. Denny
 
 , Attorney General Thomas Woolen sued the state's former attorney general, James Denny, "for the recovery of certain moneys belonging to the State."
 
 67 Ind. 148
 
 , 148 (1879). The proceeds at issue consisted of commissions Denny had collected and retained, by authority of the Act, during his tenure in public office.
 

 Id.
 

 at 149-50
 
 . Woolen argued that Denny was not entitled to these proceeds because the Act limited the attorney general only "to the ascertainment ... of the amounts paid to any public officer of the State."
 

 Id.
 

 at 157
 
 (internal quotations omitted). This Court rejected Woolen's argument as "antagonistic" to legislative intent.
 

 Id.
 

 at 157
 
 . The purpose of the Act, this Court opined, was to recoup "large amounts of these public moneys, belonging to the State and its trust funds," which "were in the hands of State and county officers, and other persons, and had been there long beyond the time when, by law,
 
 they should have been paid into the proper treasury
 
 ."
 

 Id.
 

 at 158
 
 (emphasis added). For this reason, the Court concluded, the General Assembly properly authorized "liberal commissions for the Attorney General" and his assistants, "but
 
 payable only ... out of the amounts so collected
 
 ."
 

 Id.
 

 (emphasis added).
 

 With no discussion of
 
 Denny
 
 in their briefings, Taxpayers rely instead on this Court's decision in
 
 Bartholomew County v. State ex rel. Baldwin
 
 ,
 
 116 Ind. 329
 
 ,
 
 19 N.E. 173
 
 (1888). In that case, the board of county commissioners successfully sued the former township trustee to recover outstanding money due to the Congressional Township Fund, another distinct revenue source under article 8, section 2.
 
 Id.
 
 at 330-31,
 
 19 N.E. at 174-75
 
 . Upon receipt of the proceeds, the board set aside $2,000 for its attorneys as a "reasonable fee and compensation," with the remainder paid to the Township Fund.
 
 Id.
 
 at 334,
 
 19 N.E. at 176
 
 . The Attorney General, in turn, sued the board to recover the attorneys' fees, arguing that all proceeds were dedicated exclusively "to the support of common schools, and to no other purpose whatever."
 
 Id.
 
 at 336,
 
 19 N.E. at 177
 
 . This Court agreed, holding that any revenue owing to the Congressional Township Fund "could not be diverted lawfully ... to the payment of attorney's fees," which included "the payment of fees and commissions to the attorney general."
 
 Id.
 
 at 339,
 
 19 N.E. at 178, 179
 
 .
 

 On first impression,
 
 Baldwin
 
 stands in clear tension with
 
 Denny
 
 . But a closer look at
 
 Baldwin
 
 reveals an important distinction. Unlike the contingent sources of revenue at issue in
 
 Denny
 
 (unclaimed property, fines and forfeitures, escheated estates),
 
 Baldwin
 
 involved the Congressional Township Fund, "one of the trust funds referred to in section 7 of article 8 of the constitution of 1851."
 
 Id.
 
 at 340-41,
 
 19 N.E. at 179
 
 . In 1828, Congress had approved the General Assembly's request to sell these lands (which Indiana had acquired at statehood), but only with the consent of the township inhabitants (for whom Congress had expressly reserved these lands) and only on the condition that all proceeds "be forever applied to the use of the inhabitants of the respective townships in the
 
 support of schools therein
 
 ."
 
 [23]
 

 State v. Springfield Twp., in Franklin Cty.
 
 ,
 
 6 Ind. 83
 
 , 93 (1854) (quoting Act of Jan. 24, 1828, ch. 80,
 
 1827 Ind. Acts 112
 
 , 112) (emphasis added). Delegates to the 1850-51 Constitutional Convention codified these terms in the state's new fundamental law. Article 8, section 7 considers these sales proceeds as "trust funds" which the state must "faithfully and
 
 exclusively
 
 appl[y] to the purposes for which the trust was created." Ind. Const. art. 8, § 7 (emphasis added).
 
 [24]
 

 Because the state holds these proceeds in trust for a particular beneficiary (the township inhabitants) and for a specific purpose (the support of township schools), the General Assembly has "no power to divert the congressional township fund, or the income thereof."
 
 Baldwin
 
 ,
 
 116 Ind. at 338
 
 ,
 
 19 N.E. at 178
 
 . Unlike forfeitures and other contingent revenue sources (which vest in the Common School Fund as determined by the General Assembly), the Congressional Township "lands came to [the state] as a sacred trust," and "the people, by their fundamental law, have placed it
 
 beyond the power of even the legislature
 
 " to divert "the principal of the funds arising from such lands."
 
 See
 

 Edgerton v. Huntington Sch. Twp.
 
 ,
 
 126 Ind. 261
 
 , 264,
 
 26 N.E. 156
 
 , 156-57 (1890) (emphasis added).
 
 [25]
 
 The
 
 Baldwin
 
 Court merely extended this prohibition to include the board of county commissioners.
 
 See
 

 116 Ind. at 338
 
 ,
 
 19 N.E. at 178
 
 .
 

 Finally, Taxpayers cite
 
 Howard County v. State ex rel. Michener
 
 in arguing that "this Court has 'always' held" that the Fund " 'must be devoted to the support of the common schools, without the diversion from it of a penny for any other purpose whatever.' " Appellants' Br. at 28 (quoting
 
 120 Ind. 282
 
 , 283,
 
 22 N.E. 255
 
 , 255 (1889) ). At issue in
 
 Michener
 
 was a statute requiring county auditors to conduct a full accounting of the Common School Fund. Act of Dec. 21, 1865, ch. 38, § 1,
 
 1865 Ind. Acts 144
 
 . The "amounts thus ascertained" in their reports, upon approval by the Superintendent of Public Instruction, became "conclusive evidence of the facts therein contained."
 

 Id.
 

 § 2, 1865 Ind. Acts at 144. The attorney general challenged the measure as a violation of article 8, section 2. This Court agreed, reasoning that the statute impermissibly precluded "the courts from ascertaining" the "money due the school fund."
 
 120 Ind. at 284
 
 ,
 
 22 N.E. at 255-56
 
 .
 

 The holding in
 
 Michener
 
 -that article 8 requires a full and transparent accounting of all revenue owing to the Common School Fund, and that no "legislative contrivance" can prevent the courts from assessing this information-is entirely consistent with the legislative intent of the 1873 Attorney General Act. And nothing in that decision precludes pre-accrual offsetting. While today the "county auditor shall keep a record of all fines and forfeitures and all other revenue that, by law, accrues to the fund," I.C. § 20-49-3-16(a) (2006), the Statute doesn't establish these records
 as "conclusive evidence" of the money owed the Fund.
 
 See
 

 Michener
 
 ,
 
 120 Ind. at 282
 
 ,
 
 22 N.E. at 255
 
 . Thus, the Statute is no "legislative contrivance" precluding "the courts from ascertaining" the "money due the school fund."
 

 Id.
 

 at 284
 
 ,
 
 22 N.E. at 256
 
 .
 

 Altogether, the history of education funding in Indiana belies the Taxpayers claim that, by permitting law enforcement personnel to reimburse themselves for forfeiture-execution costs, "the Civil Forfeiture Statute enables precisely what Article 8 was meant to curtail."
 
 See
 
 Appellants' Br. at 32.
 

 C. Structure and Purpose of the Indiana Constitution.
 

 Finally, the structure and purpose of our Constitution unerringly point toward article 8, section 2 permitting cost offset for forfeiture execution. We examine our Constitution's provisions "within the structure and purpose of the Constitution as a whole."
 
 State v. Monfort
 
 ,
 
 723 N.E.2d 407
 
 , 411 (Ind. 2000). When possible, we must construe these provisions harmoniously.
 

 Id.
 

 Taxpayers contend that " Article 8, Section 2 shows that the framers knew how to authorize cost-recovery when they intended to do so." Appellants' Br. at 30. In support of this argument, they direct us to another source of revenue under section 2 : proceeds from the "sales of Swamp Lands," which expressly permits expense deductions for "selecting and draining" those lands.
 
 See
 
 Ind. Const. art. 8, § 2.
 

 But this language is yet another product of federal land-grant legislation.
 
 See
 
 Act of Sept. 28, 1850, ch. 84, § 2,
 
 9 Stat. 519
 
 , 519. Although the Swamp Lands were "subject to the disposal of the legislature," Congress required the state to dedicate all sales proceeds "exclusively, as far as necessary, to the purpose of reclaiming said lands by means of the levees and drains."
 

 Id.
 

 In other words, the federal land grant contractually bound the State of Indiana to set aside "the expense of selecting and draining" the Swamp Lands before directing any remaining proceeds to the Fund.
 
 [26]
 
 The framers simply codified this language in the state's fundamental law.
 

 Free of similar offsetting restrictions, forfeitures and other contingent revenue sources under section 2 permitted the pre-accrual distribution of funds. This practice included the distribution of proceeds "derived from the sale of County Seminaries."
 
 See
 
 Ind. Const. art. 8, § 2. "It is a sufficient compliance with the constitutional requirement," this Court held, just four years after our constitutional framers adjourned, "if the seminary fund,
 
 after payment of its debts
 
 , is appropriated to common schools."
 
 Auditor & Treasurer of Grant Cty. v. Bd. of Comm'rs of Grant Cty.
 
 ,
 
 7 Ind. 315
 
 , 316 (1855) (emphasis added).
 
 [27]
 

 Still, Taxpayers characterize
 
 Grant County
 
 as an anomaly, "an episode unique to Indiana's transition from the 1816 Constitution to the 1851 Constitution." Appellants' Reply Br. at 17. But a closer look at the constitutional debates suggests otherwise.
 

 On January 27, 1851, Delegate Nathaniel Hawkins expressed support for directing
 the proceeds from county seminary sales to the Common School Fund. 2
 
 Debates
 
 at 1851, 1867-68. But he questioned the prudence of omitting from section 2 "some provision by which the honest debts and proper liabilities of county seminaries shall be paid."
 
 [28]
 

 Id.
 
 at 1868. Because of this concern, Hawkins proposed an amendment which would have required the pre-accrual allocation of sales proceeds for the payment of "all claims against any of the county seminaries arising out of the donations for their construction."
 
 Journal of the Convention of the People of the State of Indiana to Amend the Constitution
 
 807 (1851). But Hawkins' colleagues considered this constitutional proviso unnecessary, ultimately voting down the proposed amendment.
 
 See
 
 2
 
 Debates
 
 at 1868 ("Under this section they may take some of the school fund and pay their debts.") (statement of Delegate Erastus Bascom).
 

 Grant County
 
 , then, unmistakably dispelled Delegate Hawkins' doubts over whether, without an express provision, "the debts will necessarily have to be paid out of the proceeds of the sale." To be sure, the debts at issue in that case amassed prior to constitutional ratification.
 
 See
 

 7 Ind. at 315
 
 ("The commissioners of Grant county undertook, in 1849, the building of a county seminary... [before] the new constitution was adopted."). But nothing in the Court's holding limits its application to only those debts owed at the time of article 8's adoption and ratification. And as this Court has long held, our decisions "contemporaneous with" constitutional ratification receive "strong and superseding precedential value."
 
 Collins v. Day
 
 ,
 
 644 N.E.2d 72
 
 , 77 (Ind. 1994) (citing
 
 Lafayette, M. & B. R. Co. v. Geiger
 
 ,
 
 34 Ind. 185
 
 , 213 (1870) ).
 

 To resolve any doubt, we find further support for this conclusion in legislation enacted in the years immediately following constitutional ratification permitting cost offset for various article 8, section 2 revenue sources. Under the 1852 Free School Law, the General Assembly mandated that "proceeds of the [seminary] sales,
 
 after deducting the necessary expenses thereof and the amount due to individuals for advances as aforesaid
 
 , shall be placed by the county treasurer to the credit of the common school fund, to be disposed of in such manner as shall be directed by law." Act of June 12, 1852, ch. 97, § 15, 1
 
 1852 Ind. Acts 437
 
 , 439 (emphasis added). During that same legislative session, lawmakers enacted a measure permitting the pre-accrual distribution of proceeds from the liquidation of an heirless estate to "pay debts" owed by the decedent. Act of June 17, 1852, ch. 10, § 142, 2
 
 1852 Ind. Acts 246
 
 , 281. Together, these statutes demonstrate the legislature's long-standing right to permit offset before a forfeiture accrues to the Common School Fund.
 
 [29]
 

 In addition to permitting pre-accrual debt offset for heirless estates, the Act of June 17 also directed the executors of those estates to hold the property "until the expiration of five years."
 

 Id.
 

 After this time passed, executors could sell the property, with any proceeds then vesting in the Fund.
 

 Id.
 

 It is this command that survived the attorney general's challenge in
 
 Meyer
 
 that the statute violated section 2's "escheated land" provision, which-like section 2's forfeiture language-lacks explicit language permitting legislative offsetting.
 
 See
 
 Ind. Const. art. 8, § 2 (directing the Fund to consist of revenue "derived from the sale of ... [a]ll lands and other estate which shall escheat to the State, for want of heirs or kindred entitled to the inheritance"). In upholding this statutory scheme, however, the
 
 Meyer
 
 Court reasoned that the heirless property "never became a component part of the common school fund" because it had "never been sold as escheated lands."
 
 63 Ind. at 40, 41
 
 . In effect, the decision affirmed the legislative prerogative to determine how and when certain property vests in the State, despite the lack of express constitutional language permitting such an arrangement. To absolve any lingering doubts over this authority, the
 
 Meyer
 
 Court emphasized that the statute was "enacted immediately after the adoption of the present constitution of this State, by a General Assembly," the members of which "had also been members of the convention which framed that constitution."
 

 Id.
 

 at 42-43
 
 .
 

 For the reasons set forth above, our Constitution's structure and purpose refute Taxpayers' claim that, "if the framers had intended that the forfeitures clause authorize cost-reimbursement, they would have said so." Appellants' Br. at 31.
 

 Conclusion
 

 We acknowledge the critical role public schools play in nurturing our children to become productive and law-abiding citizens. There is, after all, "a legitimate, and often a close, connection between ignorance and crime." Ind. Dep't of Public Instruction
 
 Fourteenth (Third Biennial) Report of the Superintendent of Public Instruction for the State of Indiana
 
 52 (1866). But should the legislature decide to repeal the Civil Forfeiture Statute entirely, leaving neither the Common School Fund nor law enforcement with an important source of revenue, would that present Taxpayers with a constitutional claim? Would that violate article 8, section 2's mandate that the Fund "shall consist of ... all forfeitures which may accrue"? We think the answer to these rhetorical questions is a resounding "no." "[W]hether it is good policy to do [so]," however, "is a matter with the legislature," not for this Court to decide.
 
 [30]
 

 State v. Indiana & I.S.R. Co.
 
 ,
 
 133 Ind. 69
 
 , 80,
 
 32 N.E. 817
 
 , 820 (1892).
 

 Because our constitution's text, structure, and history clearly show that article 8, section 2 was "not self-acting in [its] operation,"
 
 Meyer
 
 ,
 
 63 Ind. at 40
 
 , we hold that the General Assembly may decide how and when forfeiture proceeds accrue to the Common School Fund.
 

 Judgment affirmed.
 

 Goff, J., concurs.
 

 Rush, C.J., concurs in result in Part I, concurs in Part II, and dissents from Part III, with separate opinion in which Justice David joins in part.
 

 David, J., concurs in result in Part I and concurs in Parts II and III.
 

 Slaughter, J., concurs in the judgment with separate opinion.
 

 Taxpayers sued several defendants that have united as two camps on appeal: (1) the Consolidated City of Indianapolis and Marion County, including Joseph Hogsett (in his official capacity as Mayor of Indianapolis), Paul Babcock (in his official capacity as Director of the Department of Public Safety), and Bryan Roach (in his official capacity as Chief of the Indianapolis Metropolitan Police Department); and (2) the Marion County Prosecutors Office, including Terry R. Curry (in his official capacity as Marion County Prosecuting Attorney).
 

 To be sure, the trial court's decision implicated only the 1984 Statute. But the court's rationale applies to both the 1984 and 2018 versions. And "[i]f the operation of a challenged statute is inevitable, ripeness is not defeated by the existence of a time delay before the statute takes effect."
 
 Ind. Gas Co. v. Ind. Fin. Auth.
 
 ,
 
 977 N.E.2d 981
 
 , 992 (Ind. Ct. App. 2012),
 
 aff'd in part and vacated on other grounds
 
 ,
 
 999 N.E.2d 63
 
 (Ind. 2013).
 

 Taxpayers also requested expedited consideration under Appellate Rule 21(B), which we denied.
 

 Of course, our distribution-of-powers doctrine works both ways. This Court has not hesitated in finding infringement of the judicial power.
 
 See, e.g.
 
 ,
 
 State v. Monfort
 
 ,
 
 723 N.E.2d 407
 
 , 412 (Ind. 2000) (holding that, while "the legislature has the power to create and abolish superior [and circuit] courts ... within the limits of the Constitution," it may not "do so in the middle of a judge's term" without "violat[ing] the separation of powers provision of the Indiana Constitution");
 
 Thorpe v. King
 
 ,
 
 248 Ind. 283
 
 , 287,
 
 227 N.E.2d 169
 
 , 171 (1967) (holding that the legislature cannot set aside final judgment of a court);
 
 Parkison v. Thompson
 
 ,
 
 164 Ind. 609
 
 , 626,
 
 73 N.E. 109
 
 , 115 (1905) (holding that the legislature cannot dictate "the manner and mode in which the courts shall discharge their judicial duties").
 

 The Prosecutor's Office also relies on this Court's decision in
 
 Pennsylvania Co. v. State
 
 ,
 
 142 Ind. 428
 
 , 435-36,
 
 41 N.E. 937
 
 , 940 (1895) (concluding that, even if the statutory allocation of civil fines to the prosecuting attorney were unconstitutional, as the railroad argued, "that would be a question properly arising between the state, for the benefit of the common school fund, and [the] prosecuting attorney"). But we question whether that case applies at all. While the statute at issue in
 
 Pennsylvania Co.
 
 referred to the $25 penalty as a "forfeiture," this Court, in a series of related cases, deemed it a
 
 civil
 
 fine, placing it beyond the reach of article 8, section 2.
 
 See
 

 Toledo, St. L. & K.C.R. Co. v. Stevenson
 
 ,
 
 131 Ind. 203
 
 , 204,
 
 30 N.E. 1082
 
 , 1082 (1892) (rejecting appellant's argument that proceeds from a civil fine "should go to the common school fund alone" because article 8, section 2 "has reference to fines assessed in criminal prosecutions");
 
 State v. Indiana & I.S.R. Co.
 
 ,
 
 133 Ind. 69
 
 , 79,
 
 32 N.E. 817
 
 , 820 (1892) (concluding that, because article 8, section 2 "has reference to fines assessed in criminal prosecutions," the $25 civil penalty imposed on the railroad "is not a fine, in that sense").
 
 Pennsylvania Co.
 
 expressly cites
 
 I.S.R. Co.
 
 as grounds for rejecting the railroad's argument.
 
 See
 

 142 Ind. at 436
 
 ,
 
 41 N.E. at 939
 
 .
 

 While some states may not have recognized public standing, there was "a decided preponderance of American authority in favor of the doctrine, that private persons may move for a mandamus to enforce a public duty."
 
 Union Pacific R.R. Co. v. Hall
 
 , 91 U.S. (1 Otto) 343, 355,
 
 23 L.Ed. 428
 
 (1875).
 

 The named appellant, with and on behalf of the Indiana Policy Review Foundation, is now Vice President of the United States.
 

 Although the majority in
 
 Pence
 
 spoke nothing of the public-standing doctrine, the
 
 Cittadine
 
 Court-while recognizing this silence-cursorily concluded that the language in
 
 Pence
 
 "clearly does not abrogate but rather acknowledges the ... doctrine."
 
 See
 

 State ex rel. Cittadine v. Indiana Dep't of Transp.
 
 ,
 
 790 N.E.2d 978
 
 , 983 (Ind. 2003).
 

 Flast v. Cohen
 
 created a narrow exception to the general rule of standing that permits taxpayers to challenge the expenditure of federal funds in religious schools under the express limitations of the First Amendment Establishment Clause.
 
 392 U.S. 83
 
 , 103,
 
 88 S.Ct. 1942
 
 ,
 
 20 L.Ed.2d 947
 
 (1968).
 

 Subsequent federal cases, vigilant in enforcing the separation of powers, have largely declined to extend
 
 Flast
 
 beyond its facts.
 
 See, e.g.
 
 ,
 
 Valley Forge Christian Coll. v. Americans United for Separation of Church & State
 
 ,
 
 454 U.S. 464
 
 ,
 
 102 S.Ct. 752
 
 ,
 
 70 L.Ed.2d 700
 
 (1982) ;
 
 Freedom From Religion Found., Inc. v. Nicholson
 
 ,
 
 536 F.3d 730
 
 (7th Cir. 2008).
 

 Even if we were to characterize our discussion and critique of the pertinent case law here as mere "dicta,"
 
 post,
 
 at 608, 611 (concurrence in result), that "characterization does not give to this court license to ignore the clear import of the language" in its "interpretation of the law in this area,"
 
 Stevens v. Norfolk W. Ry. Co.
 
 ,
 
 171 Ind. App. 334
 
 , 340,
 
 357 N.E.2d 1
 
 , 4 (1976).
 
 See also
 

 Fesler v. Brayton
 
 ,
 
 145 Ind. 71
 
 , 83,
 
 44 N.E. 37
 
 , 40 (1896) (stating that opinions made in prior cases, although not essential to their holdings, "are no mere obiter dicta" since "they express the kernel of the principle" applied).
 

 The characterization of taxpayer standing as a "category" of public standing,
 
 see
 

 post,
 
 at 609, 609-10 (concurrence in result), overlooks the two distinct doctrinal grounds on which Justice Dickson would have conferred standing to the plaintiff in
 
 Pence
 
 ,
 
 see
 

 652 N.E.2d at 489
 
 . And the conflation of these two doctrines, we believe, leads to the improper conclusion that a
 
 majority
 
 in
 
 Embry
 
 applied the public-standing doctrine.
 
 See
 

 798 N.E.2d at 167-69
 
 (Sullivan, J., concurring) (writing to clarify that plaintiffs had
 
 taxpayer
 
 standing to bring their claim).
 
 See also
 
 Frank Sullivan, Jr.,
 
 A Look Back: Developing Indiana Law, Post-Bench Reflections of an Indiana Supreme Court Justice
 
 ,
 
 47 Ind. L. Rev. 1217
 
 , 1230 n.94 (2014) (questioning whether there were three votes for the proposition that taxpayer standing and public standing are one in the same, with "Justice Boehm's vote being opaque on that point").
 

 On this point, the irony of
 
 Cittadine
 
 is palpable: The legislative amendment that preceded the Court's decision not only rendered the case moot, but also illustrates the malleability of state statutory law, which offers citizens a "clear avenue to make changes that public interest standing would instead leave to the judiciary." M. Ryan Harmanis, Note,
 
 States' Stances on Public Interest Standing
 
 ,
 
 76 Ohio St. L.J. 729
 
 , 743 (2015).
 

 We disagree that our opinion serves to "eliminate" the public-standing doctrine.
 
 See
 

 post,
 
 at 608-09 (concurrence in result). But we decline to consecrate that doctrine simply because it's a "long-standing feature of Indiana law."
 
 See
 
 ibid.
 

 Such an approach endorses a static view of our standing jurisprudence, ignoring the shift in doctrinal philosophy over time.
 
 Compare, e.g.
 
 ,
 
 Hamilton v. State ex rel. Bates,
 

 3 Ind. 452
 
 , 458 (1852) (concluding simply that, when a private party by writ of mandamus seeks to vindicate a public right, "it is not necessary ... that the relator should have a special interest in the matter"),
 
 with
 

 Wampler v. State ex rel. Alexander
 
 ,
 
 148 Ind. 557
 
 , 564,
 
 47 N.E. 1068
 
 , 1070 (1897) (characterizing mandamus "as an extraordinary remedy" which applies "
 
 only where the law affords no other adequate remedy
 
 ") (emphasis added),
 
 and
 

 State ex rel. Goldsmith v. Superior Court of Marion Cty., Criminal Div., Room No. Four
 
 ,
 
 463 N.E.2d 273
 
 , 275 (Ind. 1984) ("The writ of mandamus is an extraordinary remedy, viewed with
 
 extreme disfavor
 
 . As a general rule, the relator must have a clear and unquestioned right to relief before mandamus may be invoked and the respondent must have failed to perform a clear, absolute, and imperative duty imposed by law.") (emphasis added) (internal citations and quotation marks omitted).
 

 Recent decisions from this Court on broader questions of justiciability bolster this narrow exception to the general rule of standing.
 
 See, e.g.
 
 ,
 
 Berry v. Crawford
 
 ,
 
 990 N.E.2d 410
 
 , 413 (Ind. 2013) (holding that, when "the Indiana Constitution expressly assigns certain functions to the legislative branch
 
 without any contrary constitutional qualification
 
 or limitation, challenges to the exercise of such legislative powers are nonjusticiable and the doctrine of separation of powers precludes judicial consideration of the claims for relief") (emphasis added);
 

 id.
 

 at 422
 
 (Rush, J., concurring in part and dissenting in part) ("[L]egislative actions are non-justiciable if they are taken 'pursuant to specific constitutional authority and
 
 not contrary thereto
 
 .' ") (quoting
 
 Roeschlein v. Thomas
 
 ,
 
 258 Ind. 16
 
 , 28,
 
 280 N.E.2d 581
 
 , 589 (1972) ) (emphasis added in
 
 Berry
 
 ).
 

 Our holding today does not "[drive] a knife into ... precedent" and this Court's "integrity."
 
 See
 

 post,
 
 at 310-11 (concurrence in result). Instead, it identifies a rule of standing more consistent with the first principles discussed in the opinion concurring in the judgment, taking a scalpel to more than a century and a half of sometimes-conflicting precedent while still affording standing in this extreme circumstance.
 

 Convention delegates periodically consulted the "larger edition of Webster's English Dictionary."
 
 See
 
 2
 
 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana
 
 1384 (1851).
 
 See also
 

 id.
 
 at 1432 ("[I]f he will take the trouble to look into Webster's dictionary ....").
 

 Under article 8, section 2, our framers consolidated several existing sources of revenue into a "Common School fund."
 
 See
 
 Richard Gause Boone,
 
 A History of Education in Indiana
 
 212 (1892). Article 8, section 2, in its entirety, reads as follows:
 

 The Common School fund shall consist of the Congressional Township fund, and the lands belonging thereto;
 

 The Surplus Revenue fund;
 

 The Saline fund and the lands belonging thereto;
 

 The Bank Tax fund, and the fund arising from the one hundred and fourteenth section of the charter of the State Bank of Indiana;
 

 The fund to be derived from the sale of County Seminaries, and the moneys and property heretofore held for such Seminaries; from the fines assessed for breaches of the penal laws of the State; and from all forfeitures which may accrue;
 

 All lands and other estate which shall escheat to the State, for want of heirs or kindred entitled to the inheritance;
 

 All lands that have been, or may hereafter be, granted to the State, where no special purpose is expressed in the grant, and the proceeds of the sales thereof; including the proceeds of the sales of the Swamp Lands, granted to the State of Indiana by the act of Congress of the twenty eighth of September, eighteen hundred and fifty, after deducting the expense of selecting and draining the same;
 

 Taxes on the property of corporations, that may be assessed by the General Assembly for common school purposes.
 

 Although article 8, section 2 dictates that proceeds from forfeitures accrue to a fund that is a
 
 component
 
 part of the Common School Fund, we find that to be a logistical step irrelevant to our analysis and will refer to forfeiture proceeds as accruing directly to the Common School Fund.
 

 While, of course, "[a] constitutional provision that is 'not self acting' can still limit governmental action,"
 
 post,
 
 at 610 (dissent), the text of section 2 refers only to those forfeitures that "
 
 may
 
 accrue" to the Fund.
 

 This particular act applied to the incorporation of Michigan City. Acts incorporating other towns and cities contained the same or similar language.
 
 See
 
 Act of Feb. 17, 1838, ch. 5, § 52,
 
 1837 Ind. Acts 34
 
 , 44 (Terre-Haute); Act of Jan. 28, 1839, ch. 8, § 51,
 
 1838 Ind. Acts 18
 
 , 28 (Jeffersonville); Act of Feb. 22, 1840, ch. 5, § 31,
 
 1839 Ind. Acts 16
 
 , 26 (Fort Wayne); Act of Feb. 24, 1840, ch. 6, § 47,
 
 1839 Ind. Acts 31
 
 , 41 (Richmond); Act of Feb. 15, 1841, ch. 120, § 22,
 
 1840 Ind. Acts 171
 
 , 176 (Connersville); Act of Feb. 16, 1848, ch. 286, § 22,
 
 1847 Ind. Acts 378
 
 , 383 (New Columbus).
 

 As one respected historian describes them, these "reports of the state superintendent to the legislature constitute the most complete record available of the state educational system and contain recommendations for improving the system which had some influence with the lawmakers." Emma Lou Thornbrough,
 
 Indiana in the Civil War Era, 1850-1880
 
 , at 466 (1965).
 

 This compensation scheme-from nearly a century and a half ago-shows that percentage-based allocations are nothing new, in contrast to the assertion that history reveals offset costs must "demonstrate a tie to expenses incurred in obtaining each forfeiture."
 
 Post
 
 , at 611 (dissent). To be sure, "[t]his Court has never held that a civil-forfeiture statute is constitutional even though the allocations bear no correlation to expenses incurred in obtaining the forfeiture."
 

 Ibid.
 

 But we have also never held the opposite. Indeed, we have "never decided the constitutionality of" any civil forfeiture scheme.
 
 Post
 
 , at 611 n. 3. And because the former Civil Forfeiture Statute could lead to no money going to the Fund, Appellant's App. Vol. II, pp. 45 ("State Defendants are not aware of any cases that a Marion County trial court awarded forfeited property to the Common School Fund."), even the actual-cost method cannot promise to "grow" or "increase" the fund.
 
 See
 

 post
 
 , at 611.
 

 The Congressional Township Fund has its origins in the General Land Ordinance of 1785, which, in addition to establishing the systematic survey and sale of western lands, set forth the first program of land grants for schools.
 
 See
 
 Sally K. Fairfax et al.,
 
 The School Trust Lands: A Fresh Look at Conventional Wisdom
 
 ,
 
 22 Envtl. L. 797
 
 , 805 (1992).
 

 The framers noted that the State held donated lands merely in trust.
 
 See
 
 2
 
 Debates
 
 at 1863 (statement of Mr. Pettit) (remarking that section 7 "is a simple declaration" that the state would "faithfully apply" those funds received "by gift, by donation-anything for a specific purpose");
 
 id.
 
 at 1885 (statement of Mr. Dobson) (noting that the federal government donated the "Salt Springs" (the source of article 8's "Saline fund") and "every sixteenth section" of townships (the source of the "Congressional Township fund") for specific purposes).
 

 Article 8, section 2 limits legislative authority over only those Fund sources held in trust, not over contingent sources like forfeitures. Thus, article 8, section 2 does not limit "the legislature's authority in drawing the [S]tatute's contours."
 
 See
 

 post
 
 , at 610 (dissent).
 

 The Swamp Lands weren't the only federal land grant under article 8, section 2. But of those sources, it was alone in requiring cost offsetting. For example, the federal grant of Saline Lands (the source of section 2's "Saline fund") required only that Indiana sell those lands at a specific price and to "apply the proceeds of said sale to the purpose of education." Act of July 3, 1832, ch. 155,
 
 4 Stat. 558
 
 , 558.
 

 Grant County
 
 was the
 
 first
 
 case from this Court to discuss article 8, section 2.
 

 Delegate Hawkins represented Randolph, Jay, and Blackford Counties at the constitutional convention. 1
 
 History of Jay County
 
 92 (Milton T. Jay ed., 1922). Before that, Hawkins "represented the counties of Jay and Adams in the Legislature of Indiana" in 1842.
 

 Id.
 

 After the convention, Hawkins became the first judge of the Court of Common Pleas for Jay County before dying in October 1853.
 

 Id.
 

 Suffice it to say, Hawkins was well-entrenched in mid-nineteenth century Indiana politics.
 

 Additional legislation from the mid-nineteenth century allowed offsets from other contingent revenue sources intended for the Common School Fund. An 1857 statute, for example, set aside for an informant "one half" of a criminal fine imposed on persons hunting out of season, with the "other half" directed "to the common school fund." Act of Feb. 26, 1857, ch. 31, §§ 1, 2,
 
 1857 Ind. Acts 39
 
 , 39. And in 1872, the legislature directed the proceeds from the sale of tax delinquent properties to "the common school fund of this State,
 
 after deducting the expenses and charges of the sale
 
 ." Act of Dec. 21, 1872, ch. 37, § 207,
 
 1872 Ind. Acts 57
 
 , 110 (emphasis added).
 

 Today, the Common School Fund does not help directly finance our public schools. Instead, it is used to make "advances" to schools for various specified purposes.
 
 See
 
 I.C. 20-49-3-8.