**FILED**

Apr 07 2016, 6:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Kevin E. Steele
Burke Costanza & Carberry LLP
Valparaiso, Indiana

ATTORNEY FOR APPELLEE

Jonathan Halm
Abrahamson, Reed & Bilse
Hammond, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Victor J. DiMaggio III,<br>*Appellant-Plaintiff,*<br><br>v.<br><br>Elias Rosario,<br>*Appellee-Defendant.*<br><br>———————<br><br>Elias Rosario,<br><br>*Cross-Appellant/Counter-Plaintiff,*<br><br>v.<br><br>Victor J. DiMaggio III,<br><br>*Cross-Appellee/Counter-Defendant.* | April 7, 2016<br><br>Court of Appeals Case No.<br>64A03-1505-PL-466<br><br>Appeal from the Porter Superior<br>Court.<br>The Honorable William Alexa,<br>Judge.<br>Cause No. 64D02-0803-PL-2790 |

**Darden, Senior Judge**

# Statement of the Case

Victor J. DiMaggio appeals from the trial court's order granting summary judgment in favor of Elias Rosario on DiMaggio's complaint alleging breach of an oral contract; breach of fiduciary duty; and, usurpation of corporate opportunity. Rosario cross-appeals, contending, in the alternative, that the trial court erred by denying his first motion for summary judgment based on the statute of limitation. We affirm.

# Issues

DiMaggio presents the following issues for review:

> I. Whether the trial court erred by granting summary judgment in favor of Rosario after finding there was no oral contract and thus no breach;
>
> II. Whether the trial court erred by granting summary judgment in favor of Rosario on DiMaggio's claims of breach of fiduciary duty and usurpation of corporate opportunity.

Rosario cross-appeals raising the following issue for our review in the event we reverse the decision of the trial court:

> III. Whether the trial court erred by denying Rosario's motion for partial summary judgment based on the statute of limitation.

## Facts and Procedural History

[3] Since this is the third time the parties have appeared before this Court, perhaps a brief background of their relationship will help to put the case in its proper perspective.

[4] DiMaggio was the owner of Financial Advantage Corporation, a Delaware corporation based in Chicago that was in the business of providing financial services. From 1996 until 2002, Rosario served as an employee, officer, director, and shareholder of DiMaggio's company.

[5] In 1996 and again in 1997, DiMaggio and Rosario, both certified public accountants and entrepreneurs, decided to expand their business relationship. First, in January 1996, they formed Schererville Real Estate Holding, LLC, an Indiana limited liability corporation, for the purpose of investing in real estate with its principal place of business in Lake County, Indiana. Rosario and DiMaggio were each fifty percent shareholders in Schererville. Schererville owned real estate consisting of an office building and land in Schererville, Indiana.

[6] Next, on December 29, 1997, they formed Galleria Realty Corporation, an Indiana, closely-held corporation. Galleria's principal place of business was in Lake County, Indiana, and its purpose was to develop two mixed-use retail and office buildings located in Dyer, Indiana. They were the only two shareholders of Galleria. DiMaggio, who also holds a law degree, was the minority shareholder owning forty percent of the shares, with Rosario owning sixty

percent of the shares. DiMaggio was to contribute his expertise in marketing, sales, and leasing of the property. Rosario was to contribute his expertise in the build-out of the tenant spaces. Although the record discloses that DiMaggio and Rosario were involved in Financial Advantage Corporation, Schererville Real Estate Holding, LLC, and Galleria, DiMaggio and Rosario may have been engaged in other joint business ventures not noted in the record before us.

[7] The first phase of the Galleria construction was completed in 2000, consisting of twenty four suites in a four-story 41,000 square foot mixed-use retail and office building. The second phase was completed in 2004, consisting of ten suites in a three-story 32,973 square-foot mixed-use retail and office building. Thus, after completion of the two phases, there was more than 73,000 total square feet of mixed-use retail and office building space.

[8] Rosario and DiMaggio developed an estimation of projected income for the years 2000 to 2009 for Galleria. The "Galleria Realty Corporation Projected Income Statement Years 2000 to 2009" was based upon a projection of potential income and planned joint contributions to the business endeavor of Galleria. Appellant's App. pp. 163-65.

[9] According to DiMaggio's answers to interrogatories dated October 31, 2014, sometime in early 2002, Rosario sent an abandonment letter[1] to DiMaggio.

---

[1] Although the letter is referred to in the designated materials, in some instances where it is noted as being attached as an exhibit, a copy of the letter is not before us in the record. Likewise, the transcriptions of voice mail messages referenced in the designated materials are not before us in the record.

Apparently, DiMaggio wanted to discuss resolution of Rosario's abandonment letter, but received no compliance from Rosario. DiMaggio stated that Rosario's response to him on March 9, 2002, convinced him that Rosario was committed to abandoning the Galleria business venture. *Id.* at 429.

[10] At some point, Rosario had come to believe that DiMaggio was engaging in improper business practices with respect to Financial Advantage Corporation. As a result, on December 10, 2002, Rosario sought to enter into a stock redemption agreement for his forty shares of common stock, a promissory note for fifty payments totaling $50,000.00 for the stock, and a general release. DiMaggio signed a stock redemption agreement as President of Financial Advantage Corporation; however, no promissory note or general release was executed.

[11] In late 2002 or early 2003, Rosario commenced pursuing a real estate business venture in Porter County with Mark Nebel and William C. Haak. The three formed Liberty Lake Estates, LLC, in order to purchase an existing residential subdivision by the same name with the intent of improving it, and selling it to residential customers. Rosario's role in that venture was to oversee the development, which was comprised of thirty-eight residential lots.

[12] DiMaggio and Rosario met on August 27, 2003 at the Galleria complex. At that meeting, DiMaggio pressed Rosario to explain why he had abandoned his duties with Galleria. According to DiMaggio, Rosario replied that "it was something I had to do." *Id.* at 434. Later, on September 9, 2003, Professional

Building Services (PBS) in Crete, Illinois, requested a meeting with both DiMaggio and Rosario regarding the design of the second phase of the Galleria project. Although Rosario attended the meeting, apparently he did not participate in it and left early, and DiMaggio answered most if not all of the questions. DiMaggio, in response to interrogatories proposed by Rosario, acknowledged that Rosario did not participate in the meeting, left early, and PBS expressed concern over his lack of participation at the meeting. *Id.*

[13] Rosario claimed that in November 2003, DiMaggio changed the locks to the corporate offices of Galleria, thereby denying Rosario access to Galleria's corporate records, tax documents, financial documents, tenant leases, bank account information, and loan documentation. Rosario also claimed that he received no notice of corporate or shareholder meetings, and did not receive any K-1 tax reporting forms, profits, dividends, or money owed to him due to his status as shareholder in Galleria.

[14] On February 17, 2004, Financial Advantage Corporation filed a "Verified Complaint for Accounting and Other Relief" against Rosario in the Circuit Court of Cook County, Illinois. Appellee's App. p. 103. DiMaggio, as President of Financial Advantage Corporation, was present when Rosario's deposition was taken on March 14, 2006 in that case. Rosario answered questions about his involvement in Liberty Lake Estates. In DiMaggio's deposition taken on April 6, 2006, DiMaggio testified about conversations he had with others—the first in April of 2003, and the second in May of 2004—

concerning his knowledge of Rosario's involvement in Liberty Lake Estates. *Id.* at 35.

[15] Subsequently, on March 26, 2008, DiMaggio filed a complaint against Rosario, Nebel, Haak, and Liberty Lake Estates, LLC, alleging among other things that they usurped a corporate opportunity from Galleria, causing damages to DiMaggio. The trial court granted a motion to dismiss filed by Nebel, Haak, and Liberty Lake Estates, LLC. This court affirmed the trial court's decision. *See DiMaggio v. Rosario,* 950 N.E.2d 1272 (Ind. Ct. App. 2011), *trans. denied*.

[16] DiMaggio then requested leave to file an amended complaint naming Rosario and Nebel as the only defendants. After DiMaggio was granted leave to do so, Nebel filed a motion to dismiss the amended complaint, asserting that DiMaggio's claim against him personally was barred by *res judicata*. The trial court granted the motion to dismiss as to Nebel only and we affirmed the trial court's decision. *See DiMaggio v. Rosario*, No. 64A04-1204-PL-169 (Ind. Ct. App. Sept. 28, 2012). After Nebel was dismissed from the action, Rosario was the only defendant remaining in the case.

[17] After DiMaggio had filed the instant lawsuit on March 26, 2008, Galleria took out a promissory note with First DuPage Bank, signed by DiMaggio as President of Galleria, on April 30, 2008, in the principal amount of $3,826,746.69. The note was secured by a mortgage on both of the mixed-use office buildings. Galleria also entered into an assignment of rents to First DuPage Bank, signed by DiMaggio as President of Galleria, on that same date.

DiMaggio also signed as personal guarantor providing that his share of the indebtedness would be limited to fifty percent of the principal amount, interest, collection costs, expenses, and attorneys' fees not to exceed $1,917,500.00. None of the documents contained Rosario's signature.

[18] On October 23, 2009, First Midwest Bank bought First DuPage Bank's title and interest in the note, mortgage, assignment of rents, and guaranty it held with respect to Galleria. Galleria stopped making payments beginning in November 2009 and continuing thereafter. On October 31, 2012, and also on November 5, 2012, First Midwest Bank served formal written notices of default and demand for payment and performance pursuant to the loan documents because Galleria had failed to make the required monthly payments.

[19] Meanwhile in the instant matter, on August 14, 2012, Rosario had filed his first motion seeking partial summary judgment against DiMaggio alleging that the allegations of breach of fiduciary duty and usurpation of a corporate opportunity were barred by the statute of limitation. Finding that there were genuine issues of material fact about the timing of DiMaggio's discovery of Rosario's alleged wrongdoing, the trial court denied that motion by order dated November 6, 2013.

[20] On April 4, 2013, First Midwest filed a complaint in the United States District Court of the Northern District of Indiana to recover under the note against Galleria; foreclose the mortgage on the property; and, to obtain a money judgment against DiMaggio as personal guarantor under the loan documents.

The loan matured on May 1, 2013, at which time the entire unpaid balance of the loan became due and owing. First Midwest then filed an amended complaint noting that the loan had matured since the filing of the original complaint. First Midwest alleged in the amended complaint that as of May 15, 2013, the outstanding aggregate amount owed by Galleria was $3,590,538.59, which included owed principal in the amount of $3,483,616.50, accrued unpaid interest of $43,956.39, default interest of $45,480.96, late charges and/or insufficient fund fees of $6,068.56, and corporate advances of $12,629.89 less $1,213.71 of unapplied funds of Galleria.

[21] On June 26, 2014, Rosario filed a second motion for summary judgment, contending that the allegations of DiMaggio's complaint could only be brought as a derivative action since the injured party was Galleria. After responses and briefing on the motion, oral argument was held on August, 15, 2014, after which the trial court took the matter under advisement.

[22] The First Midwest Bank litigation was resolved by way of a series of transactions commencing in September and October of 2014 after several settlement conferences led by a federal magistrate. To begin with, First Midwest assigned all of its rights, title and interest in Galleria's note and mortgage to Set Indiana 1 LLC. Next, Galleria, per the terms proposed by Set Indiana 1 LLC, sought a loan modification. On October 7, 2014, DiMaggio and Rosario signed a resolution as the sole shareholders and directors of Galleria, authorizing the loan modification.

[23]   Galleria and Set Indiana 1 LLC agreed to reinstate the loan, extend the terms of the maturity, and reduce the principal amount of indebtedness to $1,980,000.00, as evidenced by the terms set forth in an unsigned, undated copy of the loan modification agreement. An unsigned copy of the loan modification agreement reflects that it was made "this day, September ____, 2014, by and between Galleria Realty Corporation ("Galleria"), an Indiana corporation, Victor J. DiMaggio, III ("DiMaggio"), an Illinois resident, and Set Indiana 1, LLC ("Set Indiana"), a Florida limited liability company." Appellant's App. p. 329.

[24]   The corporate entity Set Galleria LLC purchased all of Rosario's and DiMaggio's stock in Galleria. DiMaggio's signature reflecting the transfer of his four hundred shares of stock to Set Galleria, LLC, is dated September 26, 2014. Rosario's signature reflecting the transfer of his six hundred shares of stock is dated October 7, 2014. Also on October 7, 2014, Set Galleria LLC and Galleria, by its new owner, signed a document releasing Rosario from any and all claims.

[25]   On October 8, 2014, before the trial court had ruled on Rosario's second motion for summary judgment, DiMaggio filed a notice to the trial court. In the notice, DiMaggio contended that since First Midwest Bank had been paid in full, there were no creditors to be protected by way of requiring the action to be brought as a derivative action. In DiMaggio's affidavit, which accompanied his notice, DiMaggio revealed that he was also released from any liability on his personal guaranty of the note and mortgage. On or about October 15, 2014,

Rosario filed a response to DiMaggio's notice and requested a status conference. Apparently, before receiving and considering Rosario's response, the trial court entered an order denying Rosario's second motion for summary judgment dated October 17, 2014.

[26] On October 24, 2014, Rosario filed a motion to reconsider the trial court's October 17, 2014 order denying his motion for summary judgment, noting that the trial court made no reference to receipt and consideration of Rosario's response to the notice. To his motion, Rosario attached a copy of his response, which included additional exhibits regarding the transactions that occurred in resolving the foreclosure action in the federal district court. Rosario challenged DiMaggio's contention that there were no creditors in need of protection by way of bringing the claims in a derivative action. Rosario alleged that after the transactions were completed, Galleria owed Set Indiana 1 LLC $1,980,000.00, a debt that would mature in May of 2016. Rosario argued that since he and DiMaggio sold all of their stock to Set Galleria, Galleria's debt transferred to Set Galleria by operation of law. Rosario also argued that because all of the shares of Galleria were sold to Set Galleria, DiMaggio no longer had standing to sue.

[27] On November 14, 2014, the trial court granted Rosario's motion to reconsider and vacated its prior October 17, 2014 order. Rosario was permitted to supplement his second motion for summary judgment and DiMaggio was given time in which to respond thereto. After conducting a hearing on February 13,

2015, the trial court granted Rosario's second motion for summary judgment on April 23, 2015.

[28]     With respect to DiMaggio's allegation of breach of oral contract, the trial court found that there was nothing more than a discussion and not an oral contract between Rosario and DiMaggio prior to incorporation; that DiMaggio failed to identify the duties of each party to the alleged oral contract; and, that he failed to identify consideration for the alleged oral contract. With respect to the counts alleging breach of fiduciary duty and usurpation of corporate opportunity, the trial court found that the claims were derivative because the alleged harm was to Galleria, the corporation. The trial court found that allowing DiMaggio, a former shareholder, to pursue a damages claim against Rosario, the other former shareholder, would permit an unfair distribution of recovery rightly belonging to Galleria, if at all. The trial court denied DiMaggio's motion to correct error and this appeal ensued.

# Discussion and Decision

## Standard of Review

[29]     DiMaggio challenges the trial court's order granting Rosario's second motion for summary judgment on DiMaggio's claims against Rosario. We first observe that a trial court's order granting summary judgment comes to us "cloaked with a presumption of validity." *Town of Lapel v. City of Anderson*, 17 N.E.3d 330, 332 (Ind. Ct. App. 2014) (quoting *Altevogt v. Brand*, 963 N.E.2d 1146, 1150 (Ind. Ct. App. 2012)). On appellate review of the trial court's order, we, like the trial

court, construe all facts and reasonable inferences in favor of the non-moving party to determine whether the moving party has shown, by way of designated evidence, that there is no genuine issue as to any material fact, such that it is entitled to judgment as a matter of law. *Id.* Where the dispute is one of law rather than fact, however, we apply a de novo standard of review to those materials designated to the trial court for summary judgment. *Id.* A trial court that enters factual findings and legal conclusions in its order on summary judgment assists our review by providing reasons for its decision. *Id.* However, we are not bound by them and "must affirm the trial court's entry of summary judgment if it can be sustained on any theory or basis in the record." *Id.*

[30] Our Supreme Court has set forth the appropriate standard of review as follows:

> We review summary judgment de novo, applying the same standard as the trial court: "Drawing all reasonable inferences in favor of . . . the non-moving parties, summary judgment is appropriate 'if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (quoting T.R. 56(C)). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Id.* (internal citations omitted).
>
> The initial burden is on the summary-judgment movant to "demonstrate [ ] the absence of any genuine issue of fact as to a determinative issue," at which point the burden shifts to the non-movant to "come forward with contrary evidence" showing an issue for the trier of fact. *Id.* at 761-62 (internal quotation marks and substitution omitted). And "[a]lthough the non-moving

party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court." *McSwane v. Bloomington Hosp. & Healthcare Sys.*, 916 N.E.2d 906, 909-10 (Ind. 2009) (internal quotation marks omitted).

. . . .

Even though Indiana Trial Rule 56 is nearly identical to Federal Rule of Civil Procedure 56, we have long recognized that "Indiana's summary judgment procedure . . . diverges from federal summary judgment practice." *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.*, 644 N.E.2d 118, 123 (Ind. 1994). In particular, while federal practice permits the moving party to merely show that the party carrying the burden of proof lacks evidence on a necessary element, we impose a more onerous burden: to affirmatively "negate an opponent's claim." *Id.* Our choice to heighten the summary judgment burden has been criticized because it may let summary judgment be precluded by as little as a non-movant's "mere designation of a self-serving affidavit." *E.g., Deuitch v. Fleming*, 746 N.E.2d 993, 999-1000 (Ind. Ct. App. 2001), *trans. denied*.

*Hughley v. State*, 15 N.E.3d 1000, 1003-04 (Ind. 2014).

# I. Breach of Oral Contract

DiMaggio argues that the trial court erred by concluding that Rosario did not breach an oral contract. In reaching that conclusion, the trial court stated as follows:

> In reviewing the record and briefs, there is nothing to indicate that, if true, this agreement was anything more than mere discussion between [DiMaggio] and [Rosario] prior to incorporation and getting the project underway. There is no evidence that this discussion was a legally binding contract. Not

only has [DiMaggio] not identified the duties of each party to the alleged oral contract, but also, no consideration has yet been identified. Thus, this Court concludes that it is not a contract between the parties, and was merely a discussion between the parties.

Appellant's App. pp. 28-29.

[32] "Contracts are formed when parties exchange an offer and acceptance." *Kelly v. Levandoski*, 825 N.E.2d 850, 857 (Ind. Ct. App. 2005), *trans. denied*. Oral contracts exist when the parties agree to all of the terms of the contract. *Id.* If there is no agreement on one essential term of the contract, then there is no mutual assent, and, thus, no contract. *Id.* "A meeting of the minds of the contracting parties, having the same intent, is essential to the formation of a contract." *Id.* Whether the facts presented establish the existence of a contract is a question of law. *Id.*

[33] Here, the facts presented to the trial court established that an oral contract existed between DiMaggio and Rosario with respect to the creation and purpose of Galleria. Among the designated materials is the certificate of incorporation for Galleria issued by the Indiana Secretary of State on December 19, 1997. The articles of incorporation name Rosario as the registered agent and he and DiMaggio are listed as the incorporators. Galleria stock certificates reflected that Rosario held six hundred shares while DiMaggio held four hundred shares. In his complaint, DiMaggio set forth that he was to contribute his expertise in marketing, sales, and leasing of the property, while Rosario was to contribute his expertise in the build-out of the tenant spaces. The first phase

of the mixed-used retail and office building was completed in 2000. Additionally, DiMaggio designated documentation of his and Rosario's estimate of projected income for the years 2000 to 2009. We conclude that the designated evidence, in addition to the undisputed facts, established that the parties had engaged in an ongoing business venture for several years which supports the existence of an oral contract.

[34] The statute of limitation for actions based on an oral contract is six years after the cause of action accrues. Ind. Code § 34-11-2-7(a) (1998). Under the discovery rule, a cause of action accrues and the statute of limitation begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another. *Custom Radio Corp. v. Actuaries & Benefit Consultants, Inc.*, 998 N.E.2d 263, 268 (Ind. Ct. App. 2013). The rule applies to both tort and contract claims. *Id.*

[35] Our discussion does not end there, however. Galleria was also a closely-held corporation. "Indiana courts have characterized closely-held corporations as 'incorporated partnerships' and as such have imposed a fiduciary duty upon shareholding 'partners' to deal fairly not only with the corporation but with fellow shareholders as well." *Melrose v. Capitol City Motor Lodge, Inc.*, 705 N.E.2d 985, 991 (Ind. 1998).

[36] Under the Uniform Partnership Act, a partnership may be dissolved when there is a "change in the relation of the partners caused by any partner ceasing to be

associated in the carrying on as distinguished from the winding up of the business." Ind. Code § 23-4-1-29 (1997). Among the ways in which a partnership may be dissolved is withdrawal by a partner or abandonment. *See, e.g., Ford v. Lafayette Life Ins. Co.*, 362 F.2d 970 (D.C.Cir. 1966) (applying Indiana law finding dissolution of partnership where one of two partners withdrew); *Marksill Specialities, Inc. v. Barger*, 428 N.E.2d 65 (Ind. Ct. App. 1981) (finding abandonment by one of two partners effected a dissolution). This stands in contrast with corporations,[2] where a corporation's board of directors may propose dissolution for submission to the shareholders and the attendant notice of dissolution upon adoption by the requisite number of votes. Ind. Code §§ 23-1-45-2 (2002); 23-1-45-7 (1990).

[37] Here, there are multiple references in the designated materials to Rosario's abandonment of Galleria's business endeavors. Indeed, DiMaggio's complaint alleges damages due to Rosario's non-participation beginning very early in 2002. We have stated the following about the law of abandonment:

> The abandonment of a contract is a matter of intention to be ascertained from the facts and circumstances surrounding the transaction from which the abandonment is claimed to have resulted. An abandonment of a contract need not be express but may be inferred from the conduct of the parties and attendant circumstances. *A contract will be treated as abandoned when the acts*

---

[2] "Dissolution of partnerships differs from dissolution of corporations. The term refers to the end of the existence of the entity in the case of corporations. Under the IUPA, dissolution does not terminate the authority of partners for purposes of winding up partnership affairs or completing partnership transactions." Paul J. Galanti, 17 Ind. Prac., Business Organizations § 6.2.

*of one party, inconsistent with the existence of the contract, are acquiesced in by the other party.*

Abandonment of a contract is a mixed question of law and fact; what constitutes an abandonment is a question of law; and whether there has been an abandonment is a question of fact.

*Baker v. Estate of Seat*, 611 N.E.2d 149, 152 (Ind. Ct. App. 1993).

[38] Here, the facts establish, according to DiMaggio, that Rosario notified him before March 9, 2002, via written letter, that he was abandoning Galleria. Although DiMaggio wanted Rosario to remain with Galleria, there is no evidence that Rosario ever actively participated in the business operation of Galleria or repudiated his intention of abandoning the business venture of Galleria after sending the abandonment letter. Thereafter, DiMaggio solely continued to operate Galleria. We note that the oral contract was breached in early 2002; and, indisputably on or before March 9, 2002. The damages claimed by DiMaggio are alleged to have occurred after Rosario's abandonment and DiMaggio's acquiescence. Rosario acted consistently with abandonment and inconsistently with the terms of the contract. The evidence established that Rosario's conduct after March 2002 was consistent with someone who had abandoned a business venture.

[39] Furthermore, the statute of limitation for the breach of an oral contract is six years. Ind. Code § 34-11-2-7(a). The statute of limitation commences to run when the plaintiff knew or with the exercise of ordinary diligence could have discovered that an injury had been sustained. *Custom Radio Corp.*, 998 N.E.2d

at 268.  DiMaggio filed his lawsuit on March 26, 2008, beyond the expiration of the statute of limitation.

## II.  Breach of Fiduciary Duty and Usurpation of Corporate Opportunity

[40]  DiMaggio also alleged that Rosario breached a fiduciary duty by failing to present the Liberty Lakes residential real estate opportunity to him and Galleria before choosing to pursue it with Nebel and Haak and by failing to lend his expertise to Galleria.  DiMaggio brought this claim as a direct action.  The trial court granted summary judgment in favor of Rosario after concluding that these claims were derivative in nature.

[41]  "A direct action is '[a] lawsuit to enforce a shareholder's rights against a corporation.'"  *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 234 (Ind. 2001) (quoting Black's Law Dictionary 472 (7th ed. 1999)).  With respect to direct actions they are "typically appropriate to enforce the right to vote, to compel dividends, to prevent oppression or fraud against minority shareholders, to inspect corporate books, and to compel shareholder meetings."  *Id.*

[42]  With respect to derivative actions, they are suits "'asserted by a shareholder on the corporation's behalf against a third party . . . because of the corporation's failure to take some action against the third party."  *Id.* (quoting Black's at 455).  Derivative actions are those brought in the name of the corporation.  *Id.*  In order to bring a derivative action, a shareholder must satisfy the following four requirements:  (1) the complaint must be verified; (2) the plaintiff must have

been a shareholder at the time of the transaction of which he complains; (3) the complaint must describe the efforts made by the plaintiff to obtain the requested action from the board of directors; and, (4) the plaintiff must fairly and adequately represent the interests of the shareholders. *Id.* Cited examples of actions required to be brought by derivative action include actions to recover for loss of a corporate opportunity, recover corporate waste, and to recover damages to a corporation caused by an officer or director's self-dealing. *Id.*

[43] Although this is the general rule, courts on appeal have acknowledged that the above may not apply in the case of closely-held corporations. As adopted by our Supreme Court, the American Law Institute proposed a rule applying to closely-held corporations, which is as follows:

> In the case of a closely held corporation, the court in its discretion may treat an action raising derivative claims as a direct action, exempt it from those restrictions and defenses applicable only to derivative actions, and order an individual recovery, if it finds that to do so will not (i) unfairly expose the corporation or the defendants to a multiplicity of actions, (ii) materially prejudice the interests of creditors of the corporation, or (iii) interfere with a fair distribution of the recovery among all interested persons.

*Barth v. Barth*, 659 N.E.2d 559, 562 (Ind. 1995) (quoting A.L.I., Principles of Corporate Governance § 7.01(d)).

[44] Shareholders in a closely-held corporation stand in a fiduciary relationship to each other, such that they must deal fairly, honestly, and openly with the corporation and with their fellow shareholders. *Id.* at 561. A shareholder in a

closely-held corporation has a fiduciary duty not to appropriate to his own use a business opportunity that in equity and fairness belongs to the corporation. *McLinden v. Coco*, 765 N.E.2d 606, 615 (Ind. Ct. App. 2002). DiMaggio argues that Rosario breached the fiduciary relationship by failing to present the Liberty Lakes residential development opportunity to Galleria and by failing to participate in Galleria's business.

[45] An action for breach of fiduciary duty must be commenced within two years after the cause of action accrues. Ind. Code § 34-11-2-4 (2013). "Under Indiana's discovery rule, a cause of action accrues, and the statute of limitation begins to run, when the plaintiff knew or in the exercise of ordinary diligence could have discovered that an injury had been sustained as a result of the tortious act of another." *Del Vecchio v. Conseco, Inc.*, 788 N.E.2d 446, 449 (Ind. Ct. App. 2003).

[46] As stated earlier, according to DiMaggio, in early 2002 Rosario sent an abandonment letter to him regarding the Galleria business venture. DiMaggio felt certain that as of March 9, 2002, Rosario was committed to abandoning Galleria. DiMaggio wanted an explanation, but none was forthcoming from Rosario. In his affidavit, DiMaggio acknowledges that he subsequently learned in late 2002 or early 2003 that Rosario was pursuing another business venture, i.e., the Liberty Lakes real estate development in Porter County. The two real estate business ventures differed in purpose—Galleria, development of mixed-use real estate; and, Liberty Lakes Estates, development of a subdivision consisting of residential home lots. However, assuming for the sake of

argument that Rosario owed a fiduciary duty to DiMaggio when he was pursuing the Liberty Lakes opportunity, the facts are undisputed that DiMaggio's claims would be barred by the two-year statute of limitation because he did not file his complaint raising said claims until March 26, 2008, which is beyond the two-year statute of limitation.

[47] Our resolution of these issues is not altered by the fact that Rosario still held his 600 shares of stock in Galleria after he abandoned the enterprise, or that he later sold the shares to Set Galleria. The sale of shares was consistent with a winding up of Galleria's business and not inconsistent with Rosario's abandonment of the enterprise. Additionally, Liberty Lakes was a subdivision consisting of thirty-eight residential lots in Porter County unlike the mixed-use retail and office real estate development in Lake County. We conclude that the trial court correctly granted summary judgment in favor of Rosario, albeit on other grounds.

[48] Because of our resolution of the issues presented on appeal, we need not address Rosario's cross-appeal issue.

# Conclusion

[49] In light of the foregoing, we affirm the trial court's judgment.

Riley, J., and Brown, J., concur.