

FILED

Sep 10 2020, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

James Bopp, Jr.
Richard E. Coleson
Amanda L. Narog
Melena S. Siebert
The Bopp Law Firm, PC
Terre Haute, Indiana

ATTORNEYS FOR APPELLEE

Libby Yin Goodknight
KRIEG DeVAULT LLP
Indianapolis, Indiana

Jeffrey C. McDermott
Matthew C. Branic
KRIEG DeVAULT LLP
Carmel, Indiana

Douglas C. Haney
City of Carmel Corporation
Counsel
Carmel, Indiana

Daniyal M. Habib
Office of Corporation Counsel
Indianapolis, Indiana

Curtis T. Hill, Jr.
Attorney General
Indianapolis, Indiana

Aaron T. Craft
Benjamin M.L. Jones
Deputy Attorneys General
Indianapolis, Indiana

Michael M. Rouker
City Attorney
Bloomington, Indiana

Larry D. Allen
Daniel A. Dixon
Assistant City Attorney
Bloomington, Indiana

Ann C. Coriden
CORIDEN GLOVER, LLC
Columbus, Indiana

Alan L. Whitted
Columbus City Attorney
Columbus, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Indiana Family Institute Inc., et al.,

*Appellants-Plaintiffs,*

v.

City of Carmel, et al.,

*Appellees-Defendants.*

September 10, 2020

Court of Appeals Case No.
19A-MI-2991

Appeal from the Hamilton
Superior Court

The Honorable Michael A. Casati,
Judge

Trial Court Cause No.
29D01-1512-MI-10207

**Altice, Judge.**

# Case Summary

[1] This appeal stems from the filing of a lawsuit in 2015 by The Indiana Family Institute (IFI), Indiana Family Action (IFA), and American Family Association (AFA) (collectively, "the Companies"), against the cities of Carmel, Bloomington, Columbus, and Indianapolis (collectively, "the Cities"), challenging the constitutionality of Indiana's Religious Freedom Restoration Act[1] (RFRA) and the Cities' nondiscrimination ordinances.

[2] The Companies asserted that RFRA and the ordinances chilled their rights to free speech and the free exercise of religion under both the federal and state constitutions. More specifically, the Companies claimed that their policy of excluding same sex couples from their religious-based education programs constituted unlawful sexual orientation discrimination under the ordinances, even though RFRA was designed to permit exclusions and exceptions to those in their circumstances. In other words, the Companies claimed that because they were not churches or other religious entities as defined in the legislation, RFRA afforded them no protection, and their exclusion of same-sex couples from their events would subject them to various penalties defined in the ordinances, should the Cities choose to enforce them.

---

[1] Ind. Code § 34-13-9-1 to -11.

Summary judgment was granted in favor of the Cities and the Companies now appeal, claiming that the trial court erred in determining that they lacked standing to pursue their actions and in concluding that their claims were not ripe.

The Companies also argue that the trial court erred in refusing to take judicial notice of various online magazine and newspaper articles involving the passage of RFRA and a letter signed by several law professors addressed to the Indiana Senate Judiciary Committee that purports to be an analysis of pending legislation.

We affirm.

## Facts and Procedural History

### A. The Companies

The Companies are affiliated Christian advocacy organizations in Indiana that promote what they believe to be "the biblical teaching . . . that marriage must be between one man and one woman and sexual relations must be within that marriage context." *Appellees' Joint Appendix Vol. V* at 133-36. The Companies maintain that permitting same sex couples to attend their otherwise public programs would alter their "pro-traditional family message." *Appellant AFA's brief* at 18. Hence, they contend their policy is to exclude those known to be in same sex marriages from their workshops, presentations, and fundraising events.

[7] IFI is a nonprofit corporation founded in 1989 and is based in Carmel. One of IFI's programs is the Hoosier Leadership Series (HLS) that focuses on the well-being and health of Indiana families. HLS is designed to connect "conservative leaders from around Indiana as part of a movement to impact the social, cultural, political, and spiritual landscape of Indiana." *Appellant IFI* and *IFA's Brief* at 13.

[8] HLS events including banquets and presentations are not open to the public and interested individuals who are interested in HLS's program submit written application to IFI and undergo personal interviews. Applicants are not screened about their religious beliefs or sexual orientation, and IFI has not rejected anyone from participating in the HLS program on these bases.

[9] IFI president Curt Smith acknowledged that IFI would not necessarily know about the participants' sexual orientation, and he admitted that the organization has "served many gay people over the years." *Appellees' Joint Appendix Vol. II* at 238. Any RSVP process that IFI uses is only "for head count planning purpose[s]." *Id.* at 226. Although members of IFI and participants in the HLS series must meet "ethical" standards, those qualifications refer to characteristics that include "honesty, punctuality, and respect." *Id.* In fact, IFI educates "everyone who will listen" to its message. *Id.* at 84.

[10] Hoosier Commitment is a marriage enrichment program taught by IFI staff. Its services were offered to incarcerated and low-income individuals. Welfare agencies referred their own clientele to IFI for participation in the Hoosier

Commitment program, and the jails identified participants from within their populations. Classes were initially offered in 2010, and the program was funded in part by a one-time grant from the federal government. That grant expired in 2013, and IFI has not offered a similar program since. Smith stated that re-starting Hoosier Commitment would require an act of Congress to fund it, yet that program was not presently a "primary focus" of IFI. *Appellees' Joint Appendix Vol. IX* at 97, 99-100.

[11] IFA—the advocacy arm of IFI—is also based in Carmel. It educates the public about life, marriage, and religious freedom issues. IFA's income varies each year and is primarily generated from donations. Its work is election oriented, and it has not held an event since 2012. Moreover, IFA has not had an employee—nor has it interviewed anyone for a position of employment—since hiring two temporary field directors in 2012.

[12] Due to limited funding, IFA's only activities in 2018 were completing a voter guide and mailing postcards "to educate voters on specific issues." *Appellees' Joint Appendix Vol. II* at 87. IFA averred that it might employ "5-6 more field staff in 2018 . . . [for the purpose of educating voters] throughout the state. . . ." *Appellants' Appendix* at 66.

[13] The directors and employees of both organizations are required to sign statements of faith affirming their belief in—and willingness to abide by— Christian principles, including biblical teachings on marriage and human

sexuality. Neither IFA nor IFI will employ individuals who do not uphold and share these principles.

[14] Like IFI, IFA has no "test" as to whom they will share their message. *Appellees' Joint Appendix Vol. II* at 87-88. To be sure, IFA's representatives made it clear everyone is welcome to "come and learn and listen quietly to what . . . IFA's views were on . . . the Biblical views of marriage or sexuality, or learn about the candidates and issues that were important to IFA." *Appellees' Joint Appendix Vol. VI* at 26-27. IFA does not inquire about attendees' religious beliefs or sexual orientation as a precondition of being admitted and it does not "check or ask about sexual orientation" at the door. *Appellees' Joint Appendix Vol. II* at 87.

[15] IFA and IFI maintain that they may offer educational programs and services to the public in Carmel, Columbus, and Bloomington at some point in the future. However, they will not do so "unless the ordinances are enjoined" because they are "at risk of facing penalties if the ordinances are enforced." *Appellant IFI and IFA's Brief* at 17.

[16] AFA, located in Indianapolis, was organized in 1993. For over fifteen years, AFA has advocated a "pro-traditional" family message through its education programs. *Appellants' Appendix Vol. II* at 54. AFA also follows the biblical teaching on marriage and human sexuality. And like IFI, the board of directors and employees of AFA must sign a statement of faith, affirming their belief in Christian principles.

[17] AFA has hosted various "grassroots training conferences" that "teach people how to be more involved in the political process through either elections or contacting their legislator or informing people in their church about the issues." *Id.* at 147–48. AFA uses a conference room in its building for meetings and discussions of various issues, and it reserves the right to exclude those who are known to be in same sex marriages. The designated evidence shows, however, that AFA has not actually excluded anyone from participating in the training conferences because of sexual orientation or religious belief.

[18] Other than hosting an anti-pornography conference in the early 2000s, AFA has not offered educational services or programs in Columbus. Nonetheless, AFA claims that it intends to "host educational programs and events . . . in Indianapolis, Bloomington, and Columbus. . . ." *Appellant's Appendix Vol. II* at 71.

## B. RFRA and the Ordinances

[19] RFRA, enacted in 2015, applies to all of the Cities and their ordinances. *See* Ind. Code § 34-13-9-1. It provides that "a governmental entity may not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability." I.C. § 34-13-9-8. RFRA includes various antidiscrimination safeguards, in that it does not

> authorize a *provider* to refuse to offer or provide services,
> facilities, use of public accommodations, goods, employment, or
> housing to any member or members of the general public on the
> basis of race, color, religion, ancestry, age, national origin,

disability, sex, sexual orientation, gender identity, or United States military service.

I.C. § 34-13-9-0.7 (emphasis added).  Under RFRA, a "provider" is defined as "one . . . or more individuals, partnerships, associations, organizations, limited liability companies, corporations, and other organized groups of persons," but it does not include "[a]church or other nonprofit religious organization or society, including an affiliated school that is exempt from federal taxation . . . or "[a] rabbi, priest, preacher, minister, pastor or designee of a church or other nonprofit religious organization or society when the individual is engaged in a religious or affiliated educational function of the church or other nonprofit religious organization or society."  I.C. § 34-13-9-7.5.

[20]  The "exercise of religion" is defined in RFRA as "*any* exercise of religion, whether or not compelled by, or central to, a system of religious belief."  I.C.  § 34-13-9-5 (emphasis added).  And "person" under RFRA includes:

(1) An individual.

(2) An organization, a religious society, a church, a body of communicants, or a group organized and operated primarily for religious purposes.

(3) A partnership, a limited liability company, a corporation, a company, a firm, a society, a joint-stock company, an unincorporated association, or another entity that:

(A) may sue and be sued; and

(B) exercises practices that are compelled or limited by a system of religious belief held by:

(i) an individual; or

(ii) the individuals;

who have control and substantial ownership of the entity, regardless of whether the entity is organized and operated for profit or nonprofit purposes.

I.C. § 34-13-9-7. A person may assert a RFRA "violation or impending violation as a claim or defense" and, although a governmental entity is not required to be a party, it may intervene in the action. I.C. § 34-13-9-9.

[21] In addition to RFRA, the Cities have their own ordinances that provide against discriminatory practices that include sexual orientation and gender identity. For instance, the Columbus City Code (CCC) bars "discriminatory practices" with regard to "education" and "public accommodations." CCC § 9.24.020. The ordinance's "discriminatory practice" provision prohibits "[t]he exclusion of an individual from equal opportunities because of . . . sexual orientation . . . ; or a system which excludes individuals from equal opportunities because of . . . sexual orientation . . . ." *Id.* at 9.24.010. Under Columbus's ordinance, an "educational institution" includes all public and private school and training centers with a few exceptions that are "supported in whole or in part by state funds." It also defines a "public accommodation" as "any establishment which caters or offers its services or facilities or goods to the general public." *Id.*

[22] The sole exemptions under the Columbus ordinance permit a "religious organization, association or society or any nonprofit institution or organization

operated, supervised or controlled by or in conjunction with a religious organization, association or society" to:

> A. [limit] the sale, rental or occupancy of dwellings that it owns or operates for other than a commercial purpose to persons of the same religion; or

> B. [give] preference to persons of the same religion, unless membership in such religion is restricted because of race, color, sex, disability, national origin, religion, ancestry, sexual orientation, gender identity or age.

*Id.* at § 9.28.030.[2]

[23] The Bloomington Municipal Code (BMC) also bans "discriminatory practices" as to "education" and "access to public accommodations." BMC § 2.21.020. "Discriminatory practice"—relevant to the circumstances here—is defined as "the exclusion of a person by another person from equal opportunities because of . . . sexual orientation . . . ; or a system which excludes persons from equal opportunities because of . . . sexual orientation . . . ." *Id.* at 2.21.030(10). Although the ordinance does not define the term "education," an "[e]ducational institution" under Bloomington's ordinance includes all public and private schools and training centers, except for certain state agencies listed in the ordinance. And "public accommodation" means "any establishment

---

[2] This exemption applies only to § 9.28 ("Housing Discrimination") and is not applicable to § 9.24 ("Discrimination Generally").

which offers its services, facilities, or goods to the general public." BMC § 2.21.030(21).  There is no specific religious entity exemption in the BMC.

[24]  Carmel's ordinance prohibits discrimination in areas that include "program[s] . . . provided to the general public[.]"  Carmel City Code § 6-8(a).  The Ordinance states that

> no . . . entity located within, or conducting business within, the City's corporate limits shall discriminate against any other person . . . the . . . opportunity to participate in or enter into a place of business . . . and/or participate in or obtain any program, service, or amenity provided to the general public on the basis of . . . race, color, religion, national origin, gender, disability, sexual orientation, gender identity or expression, family or marital status, ancestry, age, and/or veteran status.

*Id.*  The Carmel ordinance sets forth the following exclusions:

> (1)  Religious worship and clergy while engaged in religious duties or activities; however, business activities by religious institutions or clergy are not excepted.
>
> (2)  A not-for-profit membership club organized exclusively for fraternal or religious purposes and/or any non-for-profit social club that is not open to the general public, so long as the same is exempt from taxation. . . .

*Id.* at § 6-8(d)(1).

[25] Indianapolis's ordinance prevents "any discriminatory practice . . . which relates to . . . public accommodations." RCI § 581-401. "Discriminatory practice" under the ordinance means "exclusion from or failure or refusal to extend to any person equal opportunities or any difference in the treatment of any person by reason of . . . sexual orientation . . . . " RC1 § 581-103(b). Like the other ordinances, "public accommodation" refers to "an establishment which caters to or offers its services, facilities or goods to the general public." *Id.*

[26] The Ordinance exempts:

> (a) any non-profit corporation, or association organized *exclusively* for fraternal or religious purposes, or to any school, education, charitable or religious institution owned or conducted by, or affiliated with, a church or religious institution, [] or any exclusively social club, corporation or association that is not organized for profit and is not in fact open to the general public."

RC1 § 581—404 (emphasis added).

[27] Against this backdrop, the Companies assert that the ordinances govern their activities because the Companies are establishments that conduct education and training programs and offer services to the general public. The Companies also maintain that they do not fall within the exemptions and exclusions in the ordinances because they are not organized *exclusively* for religious purposes; nor are they owned, conducted by, or affiliated with, a church or religious institution. Thus, the Companies' policy of excluding same-sex couples from attending their programs amounts to an unlawful discriminatory practice that

subjects the Companies to substantial fines and other costs for violating the ordinances, should they choose to present their programs and conduct their events in the Cities.

[28] Since the enactment of the ordinances, the Companies have not faced—nor are they facing—any credible threat of prosecution. No complaints have been lodged against the Companies, and they have never been assessed penalties or fines under the ordinances. Nonetheless, in 2016,[3] the Companies filed a complaint against the Cities and the State seeking declaratory and injunctive relief on the grounds that the ordinances inhibited their freedom of speech, religion, and right to expressive association under the First Amendment to the United States Constitution. More particularly, the Companies asserted that the Cities "chilled" their First Amendment rights because their activities do not fall within any of the exceptions or exemptions under the ordinances. Even though the Companies acknowledge that they are not churches or other nonprofit religious organizations, they claim to hold the same "traditional religious beliefs" as those that *do* fall within the exceptions and, therefore, deserve the same protection that the ordinances and RFRA provide. *Appellants' Appendix Vol. II* at 76. And because the Companies have a policy of excluding same sex married couples from events that are otherwise public, they are engaging in sexual orientation discrimination under the ordinances, thus putting them "at

---

[3] The Companies' initial complaint against Carmel and Indianapolis was filed on December 11, 2015. They subsequently amended the complaint on November 29, 2016, adding Bloomington, Columbus, and the State as defendants.

credible risk of enforcement and penalties." *Appellants' Appendix Vol. II* at 71. As a result, the Companies alleged that their due process and equal protection rights also were violated under both the state and federal constitutions.

[29] On January 29, 2019, the Companies moved for summary judgment, claiming that because RFRA and the ordinances prohibit them from excluding same sex couples from participating in their events without the threat of prosecution, they were unlawfully stripped of RFRA's heightened protections, and the ordinances chilled their rights to free speech and the free exercise of religion under the First Amendment as a matter of law.

[30] The Companies also requested the trial court to take judicial notice of RFRA, the ordinances, and the United States Constitution, along with various newspaper and magazine articles and a letter signed by various law school professors regarding pending legislation, as evidence in support of their motion for summary judgment.

[31] The Cities filed cross motions for summary judgment, asserting that the Companies lacked standing and that their claims were not ripe for consideration. The Cities also objected to the Companies' judicial notice request and filed a motion to strike.

[32] Following a hearing, the trial court entered summary judgment for the Cities on November 22, 2019, concluding that the Companies lacked standing and that their claims were not ripe for consideration because they are not at imminent risk of suffering injury. The trial court granted the Companies' request to take

judicial notice of the state and federal constitutions and the ordinances but denied their request as to the other documents.

[33] The Companies now appeal.

# Discussion and Decision

## I. Standard of Review

[34] On appeal from a grant of summary judgment, we stand in the shoes of the trial court and apply a de novo standard of review. *Poiry v. City of New Haven,* 113 N.E.3d 1236, 1239 (Ind. Ct. App. 2018). Summary judgment is appropriate where the designated evidence establishes that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Row v. Holt,* 864 N.E.2d 1011, 1013 (Ind. 2007). "A fact is 'material' if its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Hughley v. State,* 15 N.E.3d 1000, 1003 (Ind. 2014).

[35] We consider only those materials properly designated pursuant to Indiana Trial Rule 56 and construe all factual inferences and resolve all doubts in favor of the non-moving party. *Young v. Hood's Gardens Inc.,* 24 N.E.3d 421, 424 (Ind. 2015). We may affirm an entry of summary judgment "if it can be sustained on any theory or basis in the record." *DiMaggio v. Rosario*, 52 N.E.3d 896, 904 (Ind. Ct. App. 2016), *trans. denied.* The fact that the parties have filed cross-

motions for summary judgment does not alter this standard of review or change our analysis: the party that lost in the trial court has the burden of persuading us that the trial court erred. *Denson v. Estate of Dillard,* 116 N.E.3d 535, 539 (Ind. Ct. App. 2018).

## II. The Companies' Arguments

[36] The Companies argue that the trial court erred in concluding that they lacked standing to bring their actions against the Cities and determining that their claims were not ripe. The Companies contend that even though the Cities have not enforced their ordinances against them and have not been subject to any penalties, they are entitled to pursue declaratory and injunctive relief because their rights to free speech, free exercise of religion, and expressive-association will be burdened and "chilled," should they hold future events in the Cities. *Appellant IFI's Brief* at 17.

[37] In general, the doctrine of standing constitutes a significant restraint on the ability of Indiana courts to act. *Jones v. Sullivan*, 703 N.E.2d 1102, 1105 (Ind. Ct. App. 1998). Standing is a threshold question that "asks whether the plaintiff is the proper person to invoke a court's authority." *Horner v. Curry,* 125 N.E.3d 584, 589 (Ind. 2019). Standing ensures "the resolution of real issues through vigorous litigation" rather than "academic debate or mere abstract speculation." *Id.* Even when some constitutionally protected interest is involved, a party must show adequate injury or the immediate danger of

sustaining some injury to establish standing. *Id.* at 589; *see also Doe v. Adams,* 53 N.E.3d 483, 497 (Ind. Ct. App. 2016), *trans. denied.*

[38] To establish standing, a party must show: (1) an "injury in fact," i.e., an invasion of a legally protected interest that is concrete, particularized, actual and imminent; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that the injury will be redressed by a favorable decision. *Hulse v. Indiana State Fair Bd.,* 94 N.E.3d 726, 730-31 (Ind. Ct. App. 2018) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). If a party lacks standing, a court has no authority to act. *Jones v. Sullivan,* 703 N.E.2d 1102, 1106 (Ind. Ct. App. 1998).

[39] Closely related to standing is the doctrine of ripeness, which involves the timing of judicial review and the principle that judicial "machinery should be conserved for problems that are real and present or imminent, not squandered on problems that are abstract or hypothetical or remote." *In re Paternity of M.G.S.,* 756 N.E.2d 990, 1004 (Ind. Ct. App. 2001), *trans. denied.* A claim is not ripe for adjudication if it rests upon contingent future events "that may not occur as anticipated, or . . . may not occur at all." *Texas v. United States,* 523 U.S. 296, 300 (1988). A claim must be ripe for consideration or we will not review it. *Garau Germano, P.C. v. Robertson,* 133 N.E.3d 161, 167 (Ind. Ct. App. 2019), *trans. denied.*

[40] Relevant here is this Court's decision in *Hulse*, where the plaintiff filed a complaint for declaratory and injunctive relief asserting that a condition of

participating in the Indiana State Fair's china painting competition violated her First Amendment rights. *Hulse,* 94 N.E.3d at 728. Hulse alleged that she suffered injury because she "may be ban[ned]" from the china painting competition "if she expresse[d] disagreement with the results" of the competition and that fear "chilled" her speech. *Id.* at 731.

[41]    In awarding judgment for the State Fair Board, a panel of this court determined that "chilled" speech "may suffice" to establish standing only if the "threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Id.* (quoting *Kiser v. Reitz*, 765 F.3d 601, 607–08 (6th Cir. 2014) (additional citations omitted)). To make this showing, the plaintiff must show an "intention to engage in a course of conduct" with an arguable constitutional dimension, proscribed by a statute, and a "credible threat of prosecution." *Id.* We concluded that Hulse lacked standing to pursue her claims because she could not demonstrate that her course of conduct was proscribed by statute, i.e., that the terms and conditions with regard to the china painting expressly permitted individuals to submit grievances that pertained to the judging. *Id.* at 732.

[42]    We also observed that the evidence did not show that Hulse faced a credible threat of prosecution. *Id.* at 732. To the contrary, it was established that even after Hulse submitted grievances in 2015, she participated in the fair in 2016. *Id.* As a result, we concluded that "Hulse has not asserted an imminent injury in fact necessary to acquire standing to challenge [the Rule] as it applies to her" and, therefore, lacked standing. *Id.* at 732.

[43]     Considering the circumstances here in relation to those in *Hulse*,[4] we note that the Companies' own designated evidence establishes that no one has ever been excluded from their events. Moreover, the Companies cannot point to any exclusion policies that were in place and, as noted above, there were no inquiries about the attendees' religious beliefs or views on human sexuality prior to admission at the events. In fact, the Companies emphasized that all individuals are welcome to attend their programs, and only those who are disruptive or "actively advocate" against the issues the Companies support are subject to exclusion. *Appellees' Joint Appendix Vol. IV* at 54. The Companies do not require event attendees to share the same religious beliefs, and the Companies' own designated evidence demonstrates that they have permitted "many gay people" to attend their programs. *Appellees' Joint Appendix Vol. II* at 85-86. In fact, the Companies "want people who don't agree" with their religious views to attend their events and hear their pro-traditional-family message. *Id.* at 226.

[44]     Although the Companies claim that their rights to hold events in the Cites are chilled because of the ordinances' failure to exempt their activities from

_____

[4] We will assume for argument's sake that the Companies meet the definition of "public accommodations" under the Cities' ordinances. As noted above, while the ordinances generally include establishments that offer services, facilities, or goods to the general public, two of IFI's programs—Hoosier Commitment and HLS—have not been open to the general public, thus excluding those programs from the ordinances' definitions of "public accommodations." Participation in HLS is limited to a small group of "high-capacity leaders" who are "selected . . . through a competitive selection process" each year. Appellees' Appendix Vol. II at 82-83. When Hoosier Commitment was operational, it received attendee referrals from welfare agencies and jails. Moreover, Hoosier Commitment has been defunct since 2013.

enforcement, none of the Companies have been the subject of a complaint or investigation; nor have they been threatened with sanctions or penalties. And there is no designated evidence establishing that the Companies have received, or are likely to receive, any notice of violations.

[45] The Companies continue to hold their training events in the Cities since the passage of the ordinances, and they have not altered their presentations and programs in any fashion. In short, the Companies remain free, without interference, to express their religious views on marriage and human sexuality as they always have. Just like the plaintiff in *Hulse*, the Companies have failed to show how the ordinances subjected them to an imminent threat of harm or that they faced a credible threat of prosecution.

[46] Nonetheless, the Companies claim that they have standing to pursue their action because they *might* hold events in the future in some of the Cities. The Companies contend that *if* they hold such events and advance their beliefs to a public audience, they will have engaged in sexual orientation discrimination *if* they choose to exclude individuals who do not hold those same beliefs.

[47] Courts have occasionally allowed pre-enforcement litigation to proceed when the plaintiffs have alleged an "actual fear" that the law would be enforced against them. *See, e.g., Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 393

(1988) (permitting an action to proceed in federal court[5] where the plaintiffs-booksellers introduced several books for display and held a well-founded fear that they would be prosecuted for doing so under a state statute that prohibited any person "to knowingly display for commercial purposes in a manner whereby juveniles may examine and peruse" certain visual or written sexual or sadomasochistic material that is harmful to juveniles).

[48] In the present circumstances, however, the Companies only allege that they might offer programs and activities in some of the Cities. Such anticipated plans are wholly speculative and hypothetical, in that the Companies have not identified programs they might offer, when they might be offered, or how the events would even be funded. In short, the record is devoid of any details from which a court could determine whether the Companies' anticipated future events are subject to the ordinances, much less whether the federal or state constitutions would be violated.

[49] Finally, we reject the Companies' contention that their action should be permitted to proceed under the public standing doctrine because their claims

---

[5] The same holds true under federal standards with regard to pre-enforcement actions, in that a plaintiff who seeks prospective relief must establish that he is in immediate danger of sustaining a direct injury "as the result of the challenged official conduct, and [that] the injury or threat of injury [is] both real and immediate." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations omitted). The standing requirement is not met by showing some "conjectural" or "hypothetical" injury, *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974), or an injury that is merely "subjective." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972).

against the Cities involves the enforcement of a "public" rather than a private right. *Appellant AFA's Brief* at 42.

[50]     In *State ex rel. Steinke v. Coriden*, this court observed that

> [t]here are certain situations in which public rather than private rights are at issue and hold that the usual standards for establishing standing need not be met. This Court held in those cases that when a case involves enforcement of a public rather than a private right the plaintiff need not have a special interest in the matter nor be a public official. Specifically, the public standing doctrine eliminates the requirement that the relator have an interest in the outcome of the litigation different from that of the general public.

831 N.E.2d 751, 756 (Ind. Ct. App. 2005) (quoting *State ex rel. Cittadine v. Indiana Dep't of Transp.,* 790 N.E.2d 978, 979 (Ind. 2003)), *trans. denied*. Although the *Coriden* court did not specifically define "public right" in this context, it cited a number of examples where such a right was found to exist. *See, e.g., Miller v. City of Evansville,* 244 Ind. 1, 189 N.E.2d 823 (Ind. 1963) (a resident-taxpayer had a public right where the city's waterworks department was allegedly not authorized to contract for construction of equipment for fluoridation of public drinking water); *Davis Const. Co. v. Bd. of Comm'rs of Boone County,* 192 Ind. 144, 132 N.E. 629 (1921) (taxpayer had public right where an allegedly unconstitutional statute sought to impose property tax in the district where he lived and he owned property that was subject to assessment); *Brooks v. State, ex rel. Singer,* 162 Ind. 568, 70 N.E. 980 (1904) (a citizen-voter of Ripley County had a public interest in the constitutional apportionment of senators

and representatives throughout the state); *Hamilton v. State ex rel. Bates,* 3 Ind. 452 (1852) (holding that a citizen-taxpayer of Marion County has a public interest in the county auditor correctly discharging the duties of his office).

[51] Circumstances like the above are not present here. More specifically, RFRA operates to vindicate a private right to religious exercise. *See* Ind. Code § 34-13-9-8(b). And the injury requirement does not effectively foreclose a challenge to RFRA "by anyone." *See Coriden*, 831 N.E.2d at 756. Instead, a party would have standing to challenge RFRA or its antidiscrimination safeguards if it was notified that it had, or was imminently likely to, violate a state statute or city ordinance and the legislation "substantially burdened" their religious exercise. Ind. Code § 34-13-9-8.

[52] Additionally, as explained above, the Companies have alleged only a hypothetical intention to offer their programs and events in the Cities, along with a vague statement that certain individuals could be excluded from attending their events. They do not have a substantial present interest in offering their programs or in excluding individuals from their events. For all these reasons, the Companies may not avail themselves of the public standing doctrine and avoid the requirement of an actual or imminent injury. *See Coriden,* 831 N.E.2d at 756.

[53] In sum, the Companies' own designated evidence establishes that the Cities have neither interfered with nor chilled their First Amendment rights. Even assuming that the Companies and their programs fall within the provisions of

the Cities' ordinances, and their activities are not exempt from enforcement through RFRA safeguards or the ordinances' exceptions, there is no threat of an impending injury or a substantial risk that harm will occur.

[54] Moreover, notwithstanding the Companies' claimed policy of exclusion, the Companies have made it clear that everyone is welcome to attend their events and hear their message, regardless of sexual orientation or religious beliefs. In short, there is simply no reason to believe that RFRA and the Cities' ordinances had any effect—or will have any effect—on the Companies and their activities. For all these reasons, the trial court properly entered summary judgment for the Cities.[6]

[55] Judgment affirmed.

Bailey, J. and Crone, J., concur.

---

[6] As noted above, the Companies also challenged the trial court's denial of their requests for judicial notice of various documents including an online magazine article, several newspaper articles, and a letter signed by a number of law professors regarding the passage of pending legislation. We need not address those arguments, inasmuch as the evidentiary rulings that the Companies challenge address the merits of their contentions, and the trial court's decision to deny the Companies' request to take judicial notice of that material has no bearing on the threshold question of standing.